UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X   Case No.: 1:22-cv-1136
PATRICIA CHARLEMAGNE,

                           Plaintiff,   **COMPLAINT**

      -against-

THE EDUCATIONAL ALLIANCE, INC.,   **PLAINTIFF DEMANDS A TRIAL BY JURY**

                          Defendant.
---------------------------------------------------------X

Plaintiff PATRICIA CHARLEMAGNE ("Plaintiff"), by and through her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the Defendant as follows:

**NATURE OF THE CASE**

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), 42 U.S.C. 1981 ("Section 1981"), the New York State Human Rights Law, New York State Executive Law §§ 296 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL"), and seeks damages to redress the injuries she has suffered as a result of being discriminated against on the basis of her race (African American) and retaliated against for complaining of discrimination.

**JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES**

2. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over the claims that Plaintiff has brought under State and City law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as one or more Defendants

reside within the Southern District of New York or the acts complained of occurred therein.

5. By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 18, 2021; (b) receiving a Notice of Right to Sue from the EEOC on November 23, 2021; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing a copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A; a copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit B.

## PARTIES

6. At all relevant times, Plaintiff was and is a resident of Nassau County, the State of New York.

7. Plaintiff is an African American woman.

8. Defendant Educational Alliance ("EA") is a domestic not-for-profit organization operating under the laws of the State of New York.

9. Defendant EA has its principal office at 197 East Broadway, New York, New York, out of which the executive and administrative staff operate.

10. Upon information and belief, Defendant EA employs at least fifteen or more employees.

11. At all relevant times, Plaintiff was an employee of the Defendant EA.

## MATERIAL FACTS

Background as Executive Director

12. Plaintiff is a high-achieving and well-credentialed professional in the field of educational programs and enrichment services responsive to the needs of students, families and communities.

13. Plaintiff holds four academic degrees: 1) a B.A. in African American Studies and Government from Wesleyan University, 2) an M.P.S. in African Studies from The Graduate School of Cornell, 3) a J.D. from the James E. Beasley School of Law at Temple University, 4) and a Doctorate degree in Mid-Career Educational Leadership Program at the University of Pennsylvania Graduate School of Education.

14. On or about September 11, 2018, Defendant, The Educational Alliance, Inc. ("EA"), hired Plaintiff as the Executive Director of Community Schools & Youth Development ("ED"), earning $135,000 annually.

15. In her position, Plaintiff was responsible for the development, implementation, and oversight of programming benefiting students and parents in social, emotional, cognitive, and academic enrichment.

16. Plaintiff's portfolio included seven public schools in lower Manhattan (New York), serving nearly 2000 elementary and middle school students.

17. Plaintiff was responsible for approximately 200 program staff in carrying out her duties.

18. Plaintiff excelled in her role. She spearheaded new initiatives, built-up morale among her program staff, and implemented outcome-based metrics for school and program-focused accountability. Plaintiff also pursued grants and new funding opportunities, substantially increasing her program's budget.

19. Plaintiff reported directly to EA's Executive Vice President, Donna A. Lawrence ("Lawrence"), who was a member of EA's Executive Team.

20. Lawrence had the authority to hire, fire and affect the terms and conditions of Plaintiff's employment or to otherwise influence the decisionmaker of the same.

Background as In-house Counsel

21. On or around March 1, 2019, EA offered Plaintiff the opportunity, in addition to her ED position, to serve as in-house counsel ("Counsel") for the organization.

22. The Counsel position required Plaintiff to represent the organization in, *inter alia,* issues involving employee disputes, personnel policies, and contract matters with vendors, independent contractors, and fee for service contracts between agencies and customers.

23. Plaintiff, as Counsel, also handled all union matters including contract renewals and collective bargaining negotiations.

24. In performing her role as Counsel, Plaintiff reported to EA's President and Chief Executive Office, Alan Van Capelle ("Van Capelle"), and collaborated with EA's Executive Team.

25. Van Capelle had the authority to hire, fire and affect the terms and conditions of Plaintiff's employment.

26. EA's executive team was made up of Van Capelle, Lawrence, and two others. All members of the Executive team identify as white or non-Black.

27. In addition, Plaintiff liaised with EA's outside counsel, Howard Robbins ("Robbins") of the Proskauer Rose law firm, regarding all legal matters, on an as-needed basis. Plaintiff regularly worked with Robbins in regards to collective bargaining and union matters.

28. Robbins, in his role as outside counsel and his long-standing personal relationship with Van Capelle, had the authority to influence the decisionmakers regarding the hiring, firing, and terms and conditions of Plaintiff's employment.

4

29. Because Plaintiff assumed the role of Counsel, in addition to her ED role, EA increased Plaintiff's annual salary by $20,000, bringing her full salary to $155,000 annually.

30. Plaintiff performed her Counsel role responsibly and diligently.

Plaintiff's Work Performance

31. Throughout her employment with EA, Plaintiff never received a performance review.

32. Plaintiff received positive feedback from her superiors, verbally and publicly, including in front of other EA employees.

33. On at least one occasion, Plaintiff was referred to as a "superstar" and "the gold-standard" during an EA mandatory Town Hall.

34. On November 2, 2020, Van Capelle responded to an email Plaintiff sent him, inviting him to take part in a new book club that she was spearheading for team-building purposes. Van Capelle stated: "Many thanks for welcoming me this (sic) to the book club. What a wonderful and energizing way to begin the week. You are building a really inspiring team. Cheers, Alan."

Racial Discrimination

35. Plaintiff had every reason to believe she was adding substantial value to the organization and she found her work at EA to be meaningful.

36. However, Plaintiff also felt she and others were being discriminated against because of their race.

37. For instance, as one of five ED's at EA, she was the only non-white ED, and she was paid substantially less than all four of her peers.

38. One of the ED's being paid more, Jordan Bracket became an ED approximately a year after Plaintiff was hired.

39. In addition, Plaintiff was the only ED whose office was located in the sub-basement (two floors below the main floor). The office did not have windows and was in a state of disrepair. In the Spring of 2020, a leak occurred that destroyed all of Plaintiff's furniture and artwork.

40. Plaintiff's department, unlike any of the other departments, was comprised of mostly non-white staff. Plaintiff's staff was denied basic amenities that other staff enjoyed such as organization email addresses.

41. Upon information and belief, Plaintiff knew that EA was paying non-white staff, especially those working in her program, less than white staff.

42. Plaintiff was made aware of some of these racially-based pay disparities by employees confiding in her, as the only non-white ED, during organizational-sponsored diversity groups.

43. Plaintiff received confirmation of racially-based pay disparities from Human Resources ("HR"), as they had access to employee pay data.

44. Upon information and belief, Plaintiff knew that EA had assessed and substantiated racially-based pay disparities within the organization, but had no plan to effectively remedy them.

Complaints Regarding Inequitable Compensation

45. In or around November 2019, after working at EA for over a year, Plaintiff approached Lawrence about a pay raise. Lawrence provided no definitive response to Plaintiff.

46. After a period of time and several more conversations about a raise, Lawrence finally informed Plaintiff that Van Capelle denied her request.

47. Lawrence went on to explain, in sum and substance, while Van Capelle ("Van Capelle") will not approve a raise for Plaintiff, he was "offering" to remove Plaintiff from her role as Counsel, while allowing her to maintain her current salary.

48. Plaintiff was upset about the denial of her raise, knowing she was paid less than her four white colleagues that were ED's.

49. Moreover, Plaintiff viewed Van Capelle's "offer" to diminish her position, duties, and job title to be threatening, demeaning, and retaliatory for requesting the raise.

50. Plaintiff was further disturbed when she learned from her current (now former) colleague John Battaglia, that one of the white ED's, Rabbi Joanna Samuels ("Samuels"), had requested a $20,000 increase that same fiscal year and Lawrence had granted it.

51. Approximately five months later, in or around April 2021, Plaintiff renewed her request for a raise, this time emailing Jill Olonoff ("Olonoff"), who held the position of Controller.

52. Plaintiff's April 2, 2021 email to Olonoff, stated that she had not received a salary increase since beginning her employment with EA, and that she was interested in receiving pay parity with her counterparts at the agency.

53. Olonoff responded to Plaintiff, stating that she was not the proper person to address salary increases or pay parity with, and that Plaintiff should speak with Lawrence and Jean Desravines ("Desravines") instead. Desravines held the title Chief People & Equity Officer and he oversaw HR.

54. That same day, April 2, 2021, Plaintiff forwarded her email chain with Olonoff to Lawrence, thereby requesting the pay increase again and also complaining of inequitable pay.

55. Plaintiff informed Lawrence that she was requesting a salary increase so that her salary would be "on par with the other Executive Directors" at EA.

56. Plaintiff further informed Lawrence that a salary increase would recognize Plaintiff's efforts, successes, and value that EA attributed to her work performance.

57. For instance, at the last pre-Covid-19 pandemic Town Hall, Van Capelle told the attendees, employees of EA, that nobody else at the agency did such a phenomenal job with professional development as Plaintiff, and if anyone needed help, they should reach out to Plaintiff. Many colleagues subsequently did and she assisted and advised them.

58. Lawrence responded to Plaintiff's second request for a salary increase at an in-person meeting on April 8, 2021, and followed-up via email on April 9, 2021. In short, Lawrence avoided the issue, telling Plaintiff that all requests for salary increases would be considered during EA's Fiscal Year 2022 budget process.

59. Lawrence also notified Plaintiff that she had shared her email with Desravines, because, upon information and belief, Plaintiff had complained of discrimination in her email and Desravines headed HR.

Complaints Regarding Systemic Pay Disparities Based on Race

60. In or around the same time period in which Plaintiff was requesting a raise, Desravines sent out an email to Defendant's EDs (including Plaintiff) regarding salary increases for all staff for the Fiscal Year 2022 budget process.

61. On April 19, 2021, in response to Desravines' email about agency-wide salary increases, Plaintiff replied, stating:

8

> *I think that any strategy to systematize increases should be postponed until there is pay equity at [Defendant] EA. Again, implementing a process for increases when the starting point is not equitable perpetuates the inequities and presents a major risk to the agency… There are at least 50 others at the agency who are not being paid equitably and can point to gender, race, religion, and/or sexual orientation as being the notable difference between themselves and their higher paid peer… Salaries should be evaluated for fairness and equity across all EA departments before any increases are implemented.*

62. Plaintiff did not raise this issue casually, or because her own request was denied, but because she remained upset and concerned about the systemic pay disparities, and felt obligated as the only African American executive at the organization, to address it.

63. Approximately a year prior, Plaintiff had informally spoken with both Mark Enselman, Chief Administrative Officer, and an HR representative, who both acknowledged EA's pay equity issues and affirmed Plaintiff's suspicions that the problem existed.

64. On April 21, 2021, Desravines responded to Plaintiff's complaint of discriminatory pay disparities with hostility.

65. Desravines stated, "[a]s a manager/senior leader and our of-Counsel, you understand that you have raised an allegation that I must look into! Please provide me the names of the 50 staffers as we take these matters and allegations very seriously. Thank you so much for bringing this matter to my attention. I look forward to getting the 50 names from you so we can conduct a thorough look into each and every one of those staffers' salary."

66. In the same email, Desravines went on to state that Plaintiff's personal request for a salary increase was currently under consideration by himself and Lawrence, who would discuss it with the Executive Team and get back to her the following week.

67. The next day, April 22, 2021, Van Capelle emailed Plaintiff stating that he was aware of the complaint of discrimination she had made to Desravines, and requested that Plaintiff "provide [him] with the names of the 50 individuals who [Plaintiff claims] are being discriminated against."

68. Van Capelle demanded that Plaintiff produce the list by 9:00 am the following morning.

69. Van Capelle's response via email, along with his demand for the complete list in less than 24 hours, indicates Van Capelle was not concerned that there might be an issue of discrimination at EA. Instead, he was angry and inconvenienced by Plaintiff bringing her concerns of discrimination to light.

70. Plaintiff was upset by the hostile, retaliatory tone from both Desravines and Van Capelle, and as such, feared that identifying staff by name could adversely impact their jobs.

71. She was also concerned with identifying staff because many had shared their concerns regarding discrimination confidentially with Plaintiff during past "Lunch and Learns" hosted by the Diversity, Equity and Inclusion Committee.

72. Plaintiff called Robbins, the outside counsel she frequently worked with, to ask his advice. He advised she provide some, but not all, of the names.

73. Taking Robbins advice, Plaintiff emailed Van Capelle on April 22, 2021, a list of approximately 25 individuals that she felt were not receiving pay equity due to their membership in a protected class.

74. Plaintiff went on to say in the email to Van Capelle, "[i]f there are a significant number of pay disparities that cannot be explained by non-discriminatory factors then [Defendant] Ed Alliance should consider doing an internal audit of pay disparity issues, as any list that [Plaintiff] may be able to put together may not be comprehensive."

Retaliatory Termination

75. On May 10, 2021, a little more than two weeks after Plaintiff's email about systemic pay disparities, EA called a meeting with Plaintiff, under the auspices of discussing her request for a salary increase.

76. At the beginning of the meeting, Van Capelle first informed Plaintiff that Desravines had investigated her complaint of discrimination and lack of pay equity, and that the allegations could not be substantiated. Van Capelle claimed that the pay at EA was on par with the external market, side-stepping any findings regarding internal comparisons which would be the relevant market comparison.

77. Van Capelle then quickly pivoted to unwarranted attacks and criticism of Plaintiff regarding events and issues that were never previously addressed with Plaintiff about her conduct and performance.

78. For instance, Van Capelle criticized Plaintiff for a "lavish" holiday party that Plaintiff had organized, in December 2019, approximately one and a half years prior. The event, which included professional development, was attended by Plaintiff's former supervisor Jonathan Skolnick, and Plaintiff had received positive feedback afterwards. All expenditures were properly submitted and approved by Defendant's finance team before the event, and the expenses were allowable under a program contract.

79. Van Capelle also claimed to have just become aware of staffing issues at a programs Plaintiff oversaw. Contrary to the assertions by Van Capelle that this was a work performance issue that Plaintiff had been covering up, Lawrence and other managers were well-aware of the chronic staffing shortage – which resulted from many variables - and constantly seeking to remedy it.

11

80. The staffing issue was fully discussed during every quarterly financial meeting. Shortages of qualified applicants were also exacerbated by Covid-19 which affected the program's ability to recruit new hires, have them cleared with background checks and fingerprinting through the NYC Department of Health, and keep existing employees coming to work regularly while earning minimum wage and being scheduled for short shifts, sometimes only 2 hours per week.

81. Van Capelle continued with a campaign of unjust attacks against Plaintiff throughout the meeting, barely allowing Plaintiff a chance to respond, and not listening when she did.

82. At one point, Van Capelle, paused his verbal attack and, in sum and substance, said to Plaintiff in a demeaning and racially tinged tone, "I don't know what *that* look was.".

83. As Plaintiff calmly attempts to defend herself, Van Capelle abruptly ends the meeting, telling Plaintiff she is terminated, with palpable hostility.

84. It is clear from Van Capelle's statements at the meeting, that since April 21, 2022, the day Plaintiff complained of the pay discrimination, Van Capelle had set out on a mission to dig-up criticism of Plaintiff's work, regardless of the merit.

85. Van Capelle's new and sudden barrage of attacks on Plaintiff was without basis and entirely pretextual to support a retaliatory termination.

86. EA took this adverse action against Plaintiff just over two weeks following her complaints of discrimination.

87. Plaintiff was unlawfully discriminated and retaliated against, humiliated, degraded, and belittled.

88. As a result of Defendant's discriminatory and intolerable treatment of Plaintiff, she has suffered emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

89. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdiction limits of the Court.

90. Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

91. As such, Plaintiff demands punitive damages against Defendant.

## AS A FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER TITLE VII

92. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

93. The claim is authorized and instituted pursuant to the provisions of Title VII for relief based upon the unlawful employment practices of Defendant.

94. 42 U.S.C. §§ 2000e-2 states:

> It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to him compensation, terms, conditions, or privileges of employment, because of such individual's race…

95. Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e by discriminating against Plaintiff because she is African American.

## AS A SECOND CAUSE OF ACTION
## RETALIATION UNDER TITLE VII

96. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

97. 42 U.S.C. §§ 2000e-3 states:

> It shall be an unlawful employment practice for an employer to discriminate against any of him employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an

unlawful employment practice by the subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the subchapter.

98. Defendant engaged in unlawful employment practices prohibited by retaliating against Plaintiff for complaining of the aforementioned violations.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

100. Executive Law §296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's … race,… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

101. New York State Executive Law § 296(1)(h) provides that, "It shall be an unlawful discriminatory practice: (h) For an employer…, to subject any individual to harassment because of an individual's…race… or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint…regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions, or privileges of employment because of the individual's

102. Defendant engaged in an unlawful practice by discriminating against the Plaintiff because she is African American.

103. Plaintiff hereby makes a claim against Defendant under all of the applicable paragraphs of Executive Law Section 296.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

104. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

105. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

106. Defendant engaged in an unlawful discriminatory practice by retaliating against the Plaintiff for complaining of the aforementioned violations.

## AS A FIFTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYCHRL

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

108. The Administrative Code of City of NY § 8-107 [1] provides that,

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived…race…to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

109. Defendants engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by creating and maintaining discriminatory working conditions and otherwise discriminating against Plaintiff because she is African American.

## AS A SIXTH CAUSE OF ACTION
## RETALIATION UNDER THE NYCHRL

110. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

15

111. The Administrative Code of City of NY § 8-107 (6) forbids retaliation for engaging in protected activity.

112. Defendant engaged in an unlawful discriminatory practice by retaliating against the Plaintiff for complaining of the aforementioned violations.

**AS A SEVENTH CAUSE OF ACTION**
**DISCRIMINATION UNDER SECTION 1981**

113. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

114. Section 1981 states in relevant part as follows:

    (a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

    (b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

115. Plaintiff was discriminated against because of her race as provided under Section 1981 and has suffered damages as set forth herein.

**AS AN EIGHTH CAUSE OF ACTION**
**RETALIATION UNDER SECTION 1981**

116. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

117. Section 1981 states in relevant part as follows:

    (c) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be

       subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

       (d) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

118. Plaintiff was retaliated against because of her race as provided under Section 1981 and has suffered damages as set forth herein.

## JURY DEMAND

119. Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII, Section 1981, the NYSHRL, and the NYCHRL in that Defendants discriminated against Plaintiff on the basis of her race and retaliated against her for engaging in a protected activity;

B. Awarding damages to Plaintiff for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendant's unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action, and pre-judgment and post-judgment interest; and

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices.

Dated: New York, New York
February 9, 2022

                                          **PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By: _____
Michelle A. Caiola, Esq.
*Attorney for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901 - 2107
Mcaiola@tpglaws.com