**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
PATRICIA CHARLEMAGNE,                                      :
:   Civil Action No.: 22-cv-1136-(DLC)
                                   Plaintiff,              :
:
                 - against -                               :
:
THE EDUCATIONAL ALLIANCE, INC.,                           :
:
                                   Defendant.             :
:
:
------------------------------------------------------------------x

### DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Under Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), and in connection with Defendant's Motion for Summary Judgment, filed concurrently, Defendant The Educational Alliance, Inc. ("EA") hereby submits the following statement of material facts as to which it contends there is no genuine issue to be tried:

### EA's Mission and Leadership

1.      EA is a nonprofit, direct services organization that offers numerous educational, cultural, health, wellness, and social services to residents of the Lower East Side and East Village communities of Manhattan. (*See* Declaration of Alan van Capelle, ("van Capelle Decl."), ¶ 5).

2.      EA has written policies against discrimination and harassment and conducts annual training with its employees. (*See* Declaration of Jean Desravines, ("Desravines Decl."), ¶¶ 15–17.)

3.      The organization also takes diversity, equity, and inclusion ("DEI") initiatives seriously and has engaged at least two third party consulting agencies to help bolster DEI at EA and strengthen its Human Resources "HR" Department. (*See* van Capelle Decl., ¶¶ 14–16;

Desravines Decl., ¶¶ 9–11; Declaration of Amanda M. Leone ("Leone Decl."), Ex. 7 [van Capelle Tr. 44:16–22].)[1]

4.      Plaintiff Patricia Charlemagne ("Plaintiff") was hired by EA as the Executive Director of EA's Community Schools and Youth Development ("CSYD") program on September 12, 2018. (*See* van Capelle Decl., ¶ 11; Desravines Decl., Ex. G; Leone Decl., Ex. 5 [Pl. Tr. 106:10–18; 138:18].)[2]

5.      At the time of Plaintiff's employment, EA's leadership, also referred to as its "Executive Team," consisted of: (i) Alan van Capelle ("Mr. van Capelle"), EA's President and Chief Executive Officer; (ii) Donna Lawrence ("Ms. Lawrence"), EA's Executive Vice President of Programs; and (iii) Mark Enselman ("Mr. Enselman"), EA's Chief Financial Officer. (*See* van Capelle Decl., ¶ 12; Desravines Decl., ¶ 7.)

6.      In January 2021, EA hired Jean Desravines ("Mr. Desravines") to fill the newly-created position of Chief People and Equity Officer, rounding out EA's Executive Team at four total members/positions. (*See* van Capelle Decl., ¶ 12; Leone Decl., Ex. 7 [van Capelle Tr. 20:6–8]; Leone Decl., Ex. 6 [Desravines Tr. 14:9–11].)

7.      The Executive Team included a Black man (Mr. Desravines) and a mixed-race, non-White man (Mr. van Capelle). (*See* van Capelle Decl., ¶ 3; Desravines Decl., ¶ 5; Leone Decl., Ex. 5 [Pl. Tr. 303:19–20]; Leone Decl., Ex. 7 [van Capelle Tr. 11:21–12:4]; Leone Decl., Ex. 6 [Desravines Tr. 73:2–4].)[3]

---

[1] References to "van Capelle Tr." are to the deposition transcript of Alan van Capelle attached to the Leone Decl. as Exhibit 7.

[2] References to "Pl. Tr." are to the deposition transcript of Plaintiff Patricia Charlemagne attached to the Leone Decl. as Exhibit 5.

[3] References to "Desravines Tr." are to the deposition transcript of Jean Desravines attached to the Leone Decl. as Exhibit 6.

8.      EA is also governed by a Board of Directors ("Board") that, during the relevant time period, consisted of anywhere from 25 to 35 individuals. (*See* van Capelle Decl., ¶ 13; Leone Decl., Ex. 7 [van Capelle Tr. 16:20–17:9].)

9.      At the time of Plaintiff's employment at EA, Mr. van Capelle reported directly to the Board. (*See* van Capelle Decl., ¶ 13; Leone Decl., Ex. 7 [van Capelle Tr. 16:5–7].)

10.     Ms. Lawrence was Plaintiff's direct supervisor for approximately two years between 2019 and 2021. (*See* van Capelle Decl., ¶ 65; Leone Decl., Ex. 7 [van Capelle Tr. 116:3–5]; Leone Decl., Ex. 5 [Pl. Tr. 382:12–14].)

## EA's Programs and Executive Directors

11.     EA's services are divided into four programs: The Manny Cantor Center ("MCC"), the Center for Recovery and Wellness ("CRW"), the 14th Street Y, and Community Schools and Youth Development ("CSYD"). (*See* van Capelle Decl., ¶ 7–8; Desravines Decl., ¶ 20.)

12.     At the time of Plaintiff's employment at EA, each of the three community centers (MCC, CRW, and the 14th Street Y) and the CSYD program were overseen by an Executive Director. (*See* van Capelle Decl., ¶ 9; Leone Decl., Ex. 7 [van Capelle Tr. 22:12–15]; Leone Decl., Ex. 6 [Desravines Tr. 47:15–48:23].)

13.     In addition to Plaintiff, who served as Executive Director of CSYD, the other three Executive Directors were: Joanna Samuels ("Ms. Samuels") (Executive Director of MCC), Jordan Brackett ("Mr. Brackett") (Executive Director of the 14th Street Y), and Robert Anderson ("Mr. Anderson") (Executive Director of CRW). (*See* van Capelle Decl., ¶ 10; Desravines Decl., ¶ 22.)

14.     The Executive Directors of EA's four programs are not members of EA's Executive Team. (*See* van Capelle Decl., ¶ 12.)

15.     The budgets of each of the programs for the fiscal year 2020-2021 were as follows: MCC had a total budget of $14,537,244; 14th Street Y had a total budget of $5,938,506, which was lower than usual due to the Covid-19 pandemic (was $11,010,914 for the 2018-2019 fiscal year); CRW had a total budget of $9,563,122; and CSYD had a total budget of $5,296,792. (*See* Declaration of Mark Enselman ("Enselman Decl."), ¶ 3.)

16.     Three out of the four programs operate out of a brick-and-mortar, physical community center: MCC, CRW and the 14th Street Y. (*See* Desravines Decl., ¶¶ 44–46; van Capelle Decl., ¶ 7; Leone Decl., Ex. 6 [Desravines Tr. 51:4–10]; Leone Decl., Ex. 7 [van Capelle Tr. 27:4–18].)

### *The Manny Cantor Center*

17.     MCC is a physical, brick-and-mortar community center that houses several programs and facilities, including an art school, a family resource center, a teen center, and a fitness center. (*See* van Capelle Decl., ¶ 20; Desravines Decl., ¶ 45.)

18.     The budget for the fiscal year 2020-2021 was $14,537,244. (*See* Enselman Decl., ¶ 3.)

19.     MCC also provides robust early childhood and older adult services. (*See* van Capelle Decl., ¶¶ 20–21; Desravines Decl., ¶ 45; Leone Decl., Ex. 7 [van Capelle Tr. 71:5–6; 128:10–20].)

20.     MCC prides itself on the fact that it runs one of the first economically-integrated preschools in New York City, where classrooms are comprised of both scholarship students supported by the Head Start program and students whose families pay full tuition. (*See* van Capelle Decl., ¶ 21; Leone Decl., Ex. 7 [van Capelle Tr. 71:2–6].)

21.     MCC also offers several fee-for-service programs that require some participants to pay to engage in the programming, such as its tuition-based preschool, infant and toddler care, gym memberships and its art school. (*See* van Capelle Decl., ¶ 22; Desravines Decl., ¶ 45; Leone Decl., Ex. 7 [van Capelle Tr. 295:14–17].)

22.     In addition, for a fee, MCC affords community members the opportunity to rent physical community space in the building for basketball leagues and other special events. (*See* van Capelle Decl., ¶ 23; Desravines Decl., ¶ 45.)

23.     MCC also serves as a "headquarters" for EA in that many of the regular, full-time administrative and leadership teams have offices in the building. Executive Team members also have offices in the MCC building. (*See* van Capelle Decl., ¶ 24; Leone Decl., Ex. 6 [Desravines Tr. 15:12–20; 325:5–7].)

24.     MCC's Executive Director is responsible for supervising building operations and maintenance of two buildings owned by EA, including but not limited to snow removal, security requirements, licensing requirements, addressing any damage or necessary repairs, and ensuring the facilities meet regulatory standards and codes. (*See* van Capelle Decl., ¶ 25; Desravines Decl., ¶ 45; Leone Decl., Ex. 6 [Desravines Tr. 327:5–19]; Leone Decl., Ex. 7 [van Capelle Tr. 70:5–10].)

25.     At the time of Plaintiff's employment at EA, Ms. Samuels was MCC's Executive Director. She began her employment with EA on or about August 28, 2012 at a salary of $150,000. (*See* van Capelle Decl., ¶ 26; Leone Decl., Ex. 7 [van Capelle Tr. 266:24–267:20 (ref. Dep. Ex. 8)]; Leone Decl., Ex. 5 [Pl. Tr. 322:16–17].)

26.     At the time of Plaintiff's employment, Ms. Samuels's salary was $184,999.98. (*See* van Capelle Decl., ¶ 26; Leone Decl., Ex. 7 [van Capelle Dep. Ex. 8]; Leone Decl., Ex. 6 [Desravines Tr. 466:3–8].)

27.     Ms. Samuels received her first salary adjustment after four years of employment at EA. (*See* van Capelle Decl., ¶ 27; Leone Decl., Ex. 7 [van Capelle Dep. Ex. 8].)

28.     Ms. Samuels did not receive a salary increase between January 1, 2020 to December 31, 2021 due to the Covid-19 pandemic. (*See* van Capelle Decl., ¶ 27.)

29.     Ms. Samuels's office was located in the MCC building. (*See* Leone Decl., Ex. 5 [Pl. Tr. 324:4–7]; Leone Decl., Ex. 6 [Desravines Tr. 64:7–12].)

### *The Center for Recovery and Wellness*

30.     CRW is a physical, brick-and-mortar community center that provides services for individuals and families facing substance abuse disorders, resources for outpatient and residential addiction treatment, and other addiction recovery services. (*See* van Capelle Decl., ¶ 28; Desravines Decl., ¶ 46; Leone Decl., Ex. 6 [Desravines Tr. 51:4–10].)

31.     The budget for the fiscal year 2020-2021 was $9,563,122. (*See* Enselman Decl., ¶ 3.)

32.     CRW also operates a residential treatment facility that is open and available 24-hours a day, seven days a week. (*See* van Capelle Decl., ¶ 28; Leone Decl., Ex. 7 [van Capelle Tr. 70:16–71:2].)

33.     Due to the around-the-clock nature of CRW's services, CRW's Executive Director is responsible for supervising the center's inpatient and outpatient programs, prevention programs, and overseeing a community food program for anyone experiencing food insecurity. (*See* van Capelle Decl., ¶ 28.)

34.     Along with staff at CRW, CRW's Executive Director interacts regularly with a vulnerable population that is actively experiencing addiction or otherwise has a history of addiction. Accordingly, the Executive Director must obtain an addiction specialist certification from the Office of Addiction Services and Support ("OASAS") to operate and provide addiction services at the center. (*See* van Capelle Decl., ¶ 30; Desravines Decl., ¶ 46; Leone Decl., Ex. 7 [van Capelle Tr. 122:14–22].)

35.     Certain supervisory and managerial staff at CRW also need to have addiction specialist certifications, and the Executive Director is responsible to overseeing and ensuring the proper staff credentials. (Id.)

36.     CRW's Executive Director is also responsible for supervising building operations and maintenance, including but not limited to snow removal, security requirements, licensing requirements, addressing any damage or necessary repairs, and ensuring the facilities meet regulatory standards and codes. (*See* van Capelle Decl., ¶ 31; Leone Decl., Ex. 7 [van Capelle Tr. 70:5–10].)

37.     At the time of Plaintiff's employment, Mr. Anderson was the Executive Director of the CRW. (*See* van Capelle Decl., ¶ 32; Leone Decl., Ex. 6 [Desravines Tr. 331:21–23; Leone Decl., Ex. 7 [van Capelle Tr. 40:24–41:4].)

38.     Mr. Anderson began his employment at EA on or about May 2016 at a salary of $130,000. (*See* van Capelle Decl., ¶ 32; Leone Decl., Ex. 7 [van Capelle Dep. Ex. 8].)

39.     At the time of Plaintiff's employment, Mr. Anderson's salary was $170,000. (*See* van Capelle Decl., ¶ 32; Leone Decl., Ex. 7 [van Capelle Tr. 260:8–15].)

40.     Mr. Anderson received his first salary adjustment after one year of employment at EA. The salary adjustment directly correlated with an assessment of his credentials, one of which

was reaching the highest level of Credential Alcoholism and Substance Abuse Counselor training. (*See* van Capelle Decl., ¶ 33.)

41.     Like Ms. Samuels, Mr. Anderson did not receive a salary increase between January 1, 2020 to December 31, 2021 due to the Covid-19 pandemic. (*See* van Capelle Decl., ¶ 33.)

42.     Mr. Anderson's office was located at the CRW. (*See* van Capelle Decl., ¶ 33; Leone Decl., Ex. 6 [Desravines Tr. 64:15].)

### *The 14th Street Y*

43.     The 14th Street Y is the third of EA's physical, brick-and-mortar community centers. (*See* Desravines Decl., ¶ 44; van Capelle Decl., ¶ 34; Leone Decl., Ex. 6 [Desravines Tr. 51:4–10].)

44.     The budget for the fiscal year 2020-2021 was $5,938,506 and was lower than previous years due to Covid-19 pandemic. For example, the 2018-2019 fiscal year's budget was $11,010,914. (*See* Enselman Decl., ¶ 4.)

45.     In addition to providing local residents with access to health and wellness facilities, the 14th Street Y also provides education, arts, cultural, and enrichment programs. (*See* van Capelle Decl., ¶ 34; Desravines Decl., ¶ 44.)

46.     Like MCC, many of the 14th Street Y's programs are fee-for-service and also require fundraising in order to operate. (*See* van Capelle Decl., ¶ 35; Leone Decl., Ex. 6 [Desravines Tr. 401:14–17]; Leone Decl., Ex. 7 [van Capelle Tr. 70:10–16]; Desravines Decl., ¶ 41.)

47.     For example, the 14th Street Y runs a camp for approximately 1,000 students each summer that must generate $3 million in annual operational revenue for the center. (*See* van Capelle Decl., ¶ 35; Leone Decl., Ex. 7 [van Capelle Tr. 84:11–19].)

48.     To ensure that the summer camp is successful and enrolls the maximum number of campers, the 14th Street Y's Executive Director is tasked with advertising and promoting the camp. (*See* van Capelle Decl., ¶ 35; Leone Decl., Ex. 7 [van Capelle Tr. 84:11–24].)

49.     The 14th Street Y's fee-for-service programs also include swim classes, after-school care programs, pre-school classes, parenting classes, theatre productions and rentals, and varied levels of paid membership to utilize the facilities. (*See* van Capelle Decl., ¶ 36.)

50.     Like the Executive Directors of MCC and the CRW, the Executive Director of the 14th Street Y is also responsible for supervising operations and maintenance at the Y's two buildings, including but not limited to snow removal, security requirements, licensing requirements, addressing any damage or necessary repairs, and ensuring the facilities meet regulatory standards and codes. (*See* van Capelle Decl., ¶ 37; Leone Decl., Ex. 7 [van Capelle Tr. 70:5–10].)

51.     At the time of Plaintiff's employment, Mr. Brackett was the Executive Director of this program. (*See* Leone Decl., Ex. 6 [Desravines Tr. 35:24–25]; Desravines Decl., ¶ 22; van Capelle Decl., ¶ 38; Leone Decl., Ex. 5 [Pl. Tr. 362:24–363:4].)

52.     Mr. Brackett began his employment at EA on or about September 29, 2015 at a salary of $130,000. (*See* Leone Decl., Ex. 7 [van Capelle Tr. 262:18–22]; van Capelle Decl., ¶ 38.)

53.     At the time of Plaintiff's employment, Mr. Brackett's salary was $200,000.11. (*See* van Capelle Decl., ¶ 38; Leone Decl., Ex. 7 [van Capelle Tr. 279:6–8; Dep. Ex. 8]; Leone Decl., Ex. 5 [Pl. Tr. 316:7].)

54.     Mr. Brackett received his first salary adjustment after three years of employment at EA. (*See* van Capelle Decl., ¶ 39; Leone Decl., Ex. 7 [van Capelle Dep. Ex. 8].)

55.     Like the Executive Directors of the other three centers, Mr. Brackett did not receive a salary increase between January 1, 2020 to December 31, 2021 due to the Covid-19 pandemic. (*See* van Capelle Decl., ¶ 39.)

56.     Mr. Brackett's office was located at the 14th Street Y.  (*See* van Capelle Decl., ¶ 39; Leone Decl., Ex. 6 [Desravines Tr. 64:7–14].)

### *Community Schools and Youth Development*

57.     CSYD provides after-school enrichment and summer programs for public elementary and middle school students. (*See* van Capelle Decl., ¶ 45.)

58.     The budget for the fiscal year 2019 was $5,296,792. (*See* Enselman Decl., ¶ 3.)

59.     As the Executive Director of CSYD, Plaintiff managed these after-school programs in five different schools: P.S. 64, P.S/M.S. 140, P.S. 142, P.S./M.S. 188, and Tompkins Square Middle School ("Schools"). (*See* van Capelle Decl., ¶ 46; Leone Decl., Ex. 5 [Pl. Tr. 154:4–16]; Leone Decl., Ex. 7 [van Capelle Tr. 73:9–14].)

60.     CSYD is the only one of EA's four programs that does not operate out of a physical, brick-and-mortar location. (*See* van Capelle Decl., ¶ 47; Leone Decl., Ex. 7 [van Capelle Tr. 27:11–18].)

61.     Instead, CSYD's programs are held at the Schools primarily during afterschool hours. (*See* van Capelle Decl., ¶ 47; Leone Decl., Ex. 5 [Pl. Tr. 110:1–16; 111:13–16].)

62.     Because CSYD does not have its own brick-and-mortar location, during her tenure as Executive Director of CSYD, Plaintiff's office and the offices of CSYD staff (including Plaintiff's direct reports) were located on the lower level of MCC. (*See* van Capelle Decl., ¶ 48; Leone Decl., Ex. 7 [van Capelle Tr. 36:6–19].)

63.     Notably, Plaintiff's offer letter stated that she was the "Executive Director, Community Schools and Youth Development at the Manny Cantor Center." (*See* van Capelle Decl., ¶ 54; Desravines Decl., Ex. G.)

64.     Plaintiff's salary for her role as Executive Director of CSYD was $135,000. (*See* van Capelle Decl., ¶ 61; Desravines Decl., ¶ 41; Leone Decl., Ex. 5 [Pl. Tr., 130:7–14]; Leone Decl., Ex. 7 [van Capelle Tr. 269:24–270:4].)

### **Plaintiff's Responsibilities as Executive Director of CSYD**

65.     Unlike the Executive Directors of EA's other three programs, in her role as Executive Director of CSYD, Plaintiff did not (and was not expected to) maintain or perform operational functions for any physical building and did not supervise any custodial or operational staff. (*See* Leone Decl., Ex. 5 [Pl. Tr. 191:13–17]; Leone Decl., Ex. 7 [van Capelle Tr. 72:9–10].)

66.     Plaintiff did not oversee any fee-for-service or revenue-generating programs for EA. (*See* van Capelle Decl., ¶ 41; Desravines Decl., ¶ 47; Leone Decl., Ex. 5 [Pl. Tr. 201:24–202:3]; Leone Decl., Ex. 7 [van Capelle Tr. 72:7-9].)

67.     Plaintiff did not run any program that operated 24-hours a day, seven days a week. (*See* van Capelle Decl., ¶ 43.)

68.     Plaintiff was not expected to regularly work weekends or nights. (*See* Leone Decl., Ex. 5 [Pl. Tr. 108:25–109:13]; Leone Decl., Ex. 7 [van Capelle Tr. 72:3–5].)

69.     Plaintiff did not need any special certification(s) to run her programs. (*See* van Capelle Decl., ¶ 42.)

70.     Plaintiff was not expected to fundraise. (*See* van Capelle Decl., ¶ 42; Leone Decl., Ex. 5 [Pl. Tr. 536:9–17]; Leone Decl., Ex. 7 [Desravines Tr. 401:18–22].)

71.    Plaintiff did not oversee any early childhood or Head Start programs. (*See* Leone Decl., Ex. 5, [Pl. Tr. 529:8-10]; van Capelle Decl., ¶ 41.)

72.    Plaintiff did not operate or oversee any programs for the elderly or senior population. (*See* Leone Decl., Ex. 5, [Pl. Tr. 527:4–8]; van Capelle Decl., ¶ 41.)

### ***Managing CSYD's Budget***

73.    As Executive Director of CSYD, Plaintiff managed a budget of approximately $5 million and was responsible for "cash flow, budget to actual, forecasts, issuing the expenditures aligned with the correct budget code [and] budget source" and "managing the community schools and youth development portfolio of funding." (*See* Leone Decl., Ex. 5 [Pl. Tr., 145:11–13; 169:11–14].)

74.    Plaintiff's job description explicitly stated that she was responsible for "work[ing] with finance and program leaders to monitor expenditures, ensure accountability, and oversee budget tracking and reporting to ensure responsible, and on budget, fiscal management of programs and contracts." (*See* van Capelle Decl., ¶ 55; Ex. A.)

75.    Importantly, Plaintiff was responsible for overseeing the funding provided by the Department of Youth and Community Development ("DYCD"), a governmental agency that provides contracts for funding to schools and community-based organizations. Plaintiff was to ensure that CSYD met its contractual obligations with DYCD, including but not limited to programming requirements. (*See* Leone Decl., Ex. 5 [Pl. Tr. 145:23–146:5]; van Capelle Decl., ¶ 56.)

76.    For example, if a program is being operated at one of CSYD's affiliated Schools, then that program must specifically align with the contractual obligations set out by DYCD's guidelines in order for that program to receive funding. Any major deviation from DYCD's

guidelines would preclude a program or curriculum from receiving funding if the program was not "tagged" to the correct funding source. (*See* van Capelle Decl., ¶ 57.)

77.    DYCD contracts also required EA to maintain a certain staff-to-student ratio in its programs. If the ratios were inconsistent with the terms of use and conditions set out by the contract, EA could lose funding. (*See* van Capelle Decl., ¶ 58; Leone Decl., Ex. 5 [Pl. Tr. 402:2–15].)

78.    Relatedly, EA could also lose funding if it significantly underspent on its DYCD contracts or other grants because the source of the funds could conclude that the money allocated to a specific program or program(s) was not required. (*See* van Capelle Decl., ¶ 59.)

79.    Thus, if money provided by DYCD or another grant source at the beginning of the fiscal year was underspent, EA risked forfeiting those funds. (*See* van Capelle Decl., ¶ 59.)

80.    A majority of CSYD's programs were fully funded by DYCD every school year. (*See* van Capelle Decl., ¶ 60; Leone Decl., Ex. 6 [Desravines Tr. 399:17–20]; Leone Decl., Ex. 7 [van Capelle Tr. 72:6–9].)

81.    Once the DYCD funds were dispersed, the Executive Director (Plaintiff) would use those funds according to DYCD's specified guidelines prior to the close of the fiscal year. (*See* van Capelle Decl., ¶ 60.)

82.    In addition to DYCD, Plaintiff also managed several additional grant sources, including Arabella, Boys and Girls Club of America, and Advantage. (*See* Leone Decl., Ex. 5 [Pl. Tr. 145:14–15]; van Capelle Decl., ¶ 61.)

### *Cultivating and Maintaining Relationships with School Principals*

83.     As Executive Director of CSYD, Plaintiff's relationships and interactions with principals at CSYD-affiliated Schools "was a core responsibility." (*See* Leone Decl., Ex. 5 [Pl. Tr. 181:21–25].)

84.     Plaintiff acknowledged that in connection with developing and managing CSYD's budget, she would often work in conjunction with the principals and EA's finance team. In order to fulfill these duties, Plaintiff had to "talk to the principals to see what they needed" and "make sure we were all on the same page." (*See* van Capelle Decl., ¶ 57; Leone Decl., Ex. 5 [Pl. Tr. 169:16–21]; Leone Decl., Ex. 7 [van Capelle Tr. 116:19–22].)

85.     Plaintiff further acknowledged that building and fostering relationships with the principals was an "important" part of her job. (*See* Leone Decl., Ex. 5 [Pl. Tr. 182:24–183:11]; Leone Decl., Ex. 7 [van Capelle Tr. 116:19–22]; van Capelle Decl., ¶ 85.)

86.     Nonetheless, while she served as Executive Director of CSYD, Plaintiff's relationships with some of the principals was strained, and she recognized that certain relationships were "in the middle" and "hot and cold." (*See* Leone Decl., Ex. 5 [Pl. Tr. 547:9–548:12].)

### *Hiring and Managing Staff/Personnel*

87.     Plaintiff confirmed that oversight of the CSYD program, including its staff, was an important aspect of the work she performed as Executive Director. (*See* Leone Decl., Ex. 5 [Pl. Tr. 227:10–20].)

88.     Plaintiff's job description explicitly stated that 25% of Plaintiff's role and responsibilities included "design[ing], manag[ing] and tak[ing] overall responsibility for staff recruitment, retention, development and performance." (*See* van Capelle Decl., ¶ 55; Ex. A.)

89.     While the aforementioned job description does not specify whether Plaintiff was only responsible for CSYD's full-time employees (*i.e.*, Plaintiff's direct reports), she testified that

14

she was only responsible for hiring and supervising CSYD's full-time employees, of which there were a range of 10 to 15 during her tenure. (*See* Leone Decl., Ex. 5 [Pl. Tr. 148:1–170:9].)

90.     Plaintiff further testified that she viewed CSYD as its own "department" within EA and that in her capacity as Executive Director of CSYD, she was the "head" of that department. (*See* Leone Decl., Ex. 5 [Pl. Tr. 133:10–134:1].)

### Plaintiff's Additional Role as Counsel

91.     Plaintiff attained a law degree from Temple University and is admitted to practice law in the State of New York. (*See* Leone Decl., Ex. 5 [Pl. Tr. 89:7–10]; Leone Decl., Ex. 7 [van Capelle Tr. 144:14–15].)

92.     Approximately five months after she was hired as Executive Director of CSYD, Plaintiff took on the additional role of Counsel at EA. Mr. van Capelle was Plaintiff's supervisor in her position as Counsel. (*See* Leone Decl., Ex. 5 [Pl. Tr. 210:8–18]; Leone Decl., Ex. 7 [van Capelle Tr. 144:10-15]; van Capelle Decl., Ex. B.)

93.     With her additional position as Counsel (for which she was paid $20,000 annually), Plaintiff's total salary at EA became $155,000. (*See* Leone Decl., Ex. 5 [Pl. Tr. 211:17–22]; Leone Decl., Ex. 7 [van Capelle Tr. 155:5–9]; Desravines Decl., ¶ 41, Ex. G.)

94.     Plaintiff testified that the "biggest piece of the work" in her capacity as Counsel was "around the union," and she would mostly review contracts. (*See* Leone Decl., Ex. 5 [Pl. Tr. 212:17–214:16].)

95.     Plaintiff testified that her additional role did not significantly increase her workload. She testified that the role only required her to work an additional three to four hours per week "on average" and that there were even weeks where she did not perform any work for the

role. (*See* Leone Decl., Ex. 5 [Pl. Tr. 212:20–213:10]; Leone Decl., Ex. 7 [van Capelle Tr. 155:5–9].)

**Problems with Plaintiff's Performance**

***Concerns Raised By All Principals***

96.    The principals at the CSYD partner Schools are as follows: Daphna Guttman (P.S. 142), Suany Ramos (P.S./M.S. 188), Marlon Hosang (P.S. 64), Sonhando Estwick (Tompkins Square Middle School), and Melissa Rodriguez (P.S./M.S. 140). (*See* van Capelle Decl., ¶ 79; Leone Decl., Ex. 5 [Pl. Tr. 182:8–23].)

97.    In July 2019, less than a year after Plaintiff became Executive Director of CSYD, Principal Ramos sent an email on behalf of all five of CSYD's partner principals to Mr. van Capelle to voice concerns regarding Plaintiff, highlighting "the lack of communication" and unilateral changes related to programming and budgeting made by Plaintiff. (*See* van Capelle Decl., Ex. C; Leone Decl., Ex. 7 [van Capelle Tr. 114:4–10].)

98.    The email stated, in relevant part:

> The past year there were a number of changes within your company and we believe this has had a reverberating effect on our collaboration and communication. The lack of communication this year cannot be overstated. Changes that directly affect our community school budget were made without our knowledge or consent. Shifts in staff and leadership, which comes directly from our CS grant and AIDP were made without discussion. I had asked multiple times for meeting and up-dates regarding specifics of our budget and how the money would be utilized but was met with no reply or only partial budget information…. Items such as full time staff added to our budget were kept from me and drastically affected other areas, in which funds are utilized to provide for my students and families. I feel that your new leadership is portraying and has, I believe, made me concerned about the future of our relationship… .

(EA000381.)

99.     The principals subsequently held an in-person meeting with Mr. van Capelle to discuss their concerns in detail. (*See* van Capelle Decl., ¶ 82; Leone Decl., Ex. 7 [van Capelle Tr. 114:6–15].)

100.    Among other things, the principals told Mr. van Capelle that they believed Plaintiff was not being collaborative and was making decisions in a manner that negatively affected their schools. (*See* van Capelle Decl., ¶ 83; Leone Decl., Ex. 7 [van Capelle Tr. 114:12–25].)

101.    The principals further stated that Plaintiff was a poor communicator and failed to respond to their calls or messages – a critical function of her job as Executive Director of CSYD. (*See* van Capelle Decl., ¶ 84; Leone Decl., Ex. 7 [van Capelle Tr. 114:20–24].)

102.    In this meeting, the principals suggested Mr. van Capelle fire Plaintiff. (*See* Leone Decl., Ex. 7 [van Capelle Tr. 114:24–25; 325:19–22]; van Capelle Decl., ¶ 83).

103.    Mr. van Capelle told the principals that Plaintiff has a different style of leadership and he would not fire her at that time. Although the principals were her most important relationships, he wanted to demonstrate to Plaintiff that he supported her. (*See* van Capelle Decl., ¶ 85; Leone Decl., Ex. 7 [van Capelle Tr. 116:14–23; 326:21–327:7].)

104.    Mr. van Capelle discussed this meeting with Plaintiff and provided her with feedback, including advice and guidance on how to maintain better communication with the principals of the Schools. (*See* van Capelle Decl., ¶ 86; Leone Decl., Ex. 5 [Pl. Tr. 552:16–18].)

105.    However, unbeknownst to Mr. van Capelle and the Leadership Team, Plaintiff's performance issues persisted. (*See* van Capelle Decl., ¶ 87; Leone Decl., Ex. 5 [Pl. Tr. 326:21–327:7].).

106.    Plaintiff had failed to disclose the severity of the staffing issues, low enrollment, or disagreements with the principals internally to EA's Leadership Team. (*See* Desravines Decl., ¶¶

27–28; Leone Decl., Ex. 6 [Desravines Tr. 441:14–23]; Leone Decl., Ex. 7 [van Capelle Tr. 132:13–16; 188:7–15; 330:4–18].)

107.     The Leadership Team was unaware of the extent to which Plaintiff's programs were in disarray until a call with P.S. 142's Principal, Daphna Guttman, revealed its severity, as described below. (*See* van Capelle Decl., ¶ 87; Desravines Decl., ¶ 68; Leone Decl., Ex. 6 [Desravines Tr. 441:14–23].)

### ***The Mayor's Visit***

108.     In April 2021, Plaintiff sent an email to Mr. van Capelle and Ms. Lawrence with a subject line that stated: "Based on performance, Mayor will be visiting our 142 DYCD Program – details will follow." There was no other text within the body of the email. (*See* Leone Decl., Ex. 5 [Pl. Tr. 470:16–471:10 (ref. Dep. Ex. H)]; van Capelle Decl., ¶ 88; Ex. D; Desravines Decl., ¶ 66; Ex. J.)

109.     When Mr. van Capelle and Ms. Lawrence asked Plaintiff about the purpose of the Mayor's visit, including who arranged the visit, Plaintiff stated in a reply email: "The Mayor and Chancellor are confirmed for a site visit of our 142 CCLC program on Monday (4/26) @ 7:45 a.m. DYCD is still working on scheduling an afternoon visit." (*See* van Capelle Decl., ¶ 89, Ex. D; Desravines Decl., Ex. J.)

110.     It was odd that the Mayor would visit the DYCD programs that Plaintiff supervised at 7:45 a.m. given that the CSYD programs took place in the afternoon. Plaintiff acknowledged the strange timing of the visit: "[I]f you are coming in the morning you obviously can't see the afterschool programs." (*See* Leone Decl., Ex. 5 [Pl. Tr., 478:1–14]; Leone Decl., Ex. 6 [Desravines Tr. 430:2-5].)

111.    During his time at EA, Mr. van Capelle valued these visits to EA programs and often sought to be present if a government official came to visit one of the programs. (*See* Leone Decl., Ex. 6 [Desravines Tr. 430:5–15]; van Capelle Decl., ¶ 90; Leone Decl., Ex. 5 [Pl. Tr. 475:16–18.)

112.    Mr. van Capelle decided to reach out to Principal Daphna Guttman of P.S. 142 to inquire about the Mayor's visit and learned that it had nothing to do with Plaintiff's department or her performance, and in fact, the program was struggling.  (*See* Leone Decl., Ex. 7 [van Capelle Tr. 331:24–332:3]; van Capelle Decl., ¶¶ 91–92; Desravines Decl., ¶ 68; Leone Decl., Ex. 6 [Desravines Tr. 432:8–12].)

113.    Principal Guttman informed Mr. van Capelle that P.S. 142's after-school programs suffered from severe understaffing issues that caused the programs to be canceled regularly. (*See* Leone Decl., Ex. 6 [Desravines Tr. 441:18–23]; van Capelle Decl., ¶ 93; Desravines Decl., ¶ 69.)

114.    Principal Guttman further told Mr. van Capelle that in an attempt to solve the understaffing problem, Department of Education teachers began covering the after-school programs without pay. (*See* van Capelle Decl., ¶ 93; Desravines Decl., ¶ 69.)

115.    Principal Guttman also voiced concern about an exorbitant holiday party thrown by Plaintiff for CSYD and its staff. (*See* van Capelle Decl., ¶ 93.)

116.    These revelations prompted Mr. Capelle to reach out to other principals at EA's partner schools, and he came to find that the other principals were having similar issues with Plaintiff's programs, including severe understaffing and an increasing loss in confidence for Plaintiff's ability to run CSYD programs at the Schools. (*See* van Capelle Decl., ¶¶ 94–95; Desravines Decl., ¶ 70; Leone Decl., Ex. 6 [Desravines Tr. 446:7–10].)

### *Plaintiff's Underspent Budget*

117.    Plaintiff admitted to being a part of the budget process at EA while she served as CSYD's Executive Director. (*See* Leone Decl., Ex. 5 [Pl. Tr. 400:18–19].)

118.    With approximately six weeks left in fiscal year 2021, Plaintiff had more than half a million unspent dollars in her budget. (*See* van Capelle Decl., Ex. F; Leone Decl., Ex. 7 [van Capelle Tr. 329:20-23].)

119.    Plaintiff's then-supervisor, Ms. Lawrence, directed Plaintiff to use those unspent funds specifically to provide arts and enrichment programs for the benefit of students and their families. Ms. Lawrence stated, in part, "Alan [Mr. van Capelle] feels strongly that we should use the unspent DYCD funding to implement some outstanding programs for the children and families we serve from now until the end of the program year." (*See* van Capelle Decl., ¶ 101; Ex. E.)

120.    Instead, Plaintiff proposed using the unspent funds for professional development "strictly for staff." One of the professional development programs included paying staff to meditate and go on self-regulated walks. (*See* van Capelle Decl., ¶ 102; Ex. F.)

121.    When asked to maximize the budget in the six weeks left to spend the funds, Plaintiff instead charged to various funding sources that were not underspent or in jeopardy of being forfeited. For example, when Ms. Lawrence approved a professional development program strictly for staff (the "Saturday Program"), Plaintiff allocated the costs to Arabella. However, budget maximization would have required her to allocate some of the expenses to DYCD instead. (*See* van Capelle Decl., ¶¶ 103–104; Ex. G; Leone Decl., Ex. 5 [Pl. Tr. 165:18–166:5].)

122.    Plaintiff did not deny being instructed by Ms. Lawrence to maximize these funds and took full responsibility for the "error" when asked who approved the budget to be charged to Arabella instead of DYCD. (*See* van Capelle Decl., ¶ 105; Ex. H.)

123.     While Plaintiff knew her programs were underspent, she did not know how much money was available despite having drafted a comprehensive plan at Ms. Lawrence's request. (*See* Leone Decl., Ex. 5 [Pl. Tr. 396:17–18]; van Capelle Decl., Ex. F.)

### Problems Discovered After Plaintiff's Termination

124.     Plaintiff understood that her staff's compensation needed to be reflected in the budget for it to be accurate. (*See* Leone Decl., Ex. 5 [Pl. Tr. 400:8–21]; Leone Decl., Ex. 7 [van Capelle Tr. 135:16–136:4].)

125.     Nonetheless, after plaintiff was terminated, Ms. Samuels discovered that Plaintiff had not actually included *any* staff in the budget for her programs. (*See* van Capelle Decl., ¶ 130; Ex. L [EA000601].)

126.     It was also later discovered that Plaintiff had attributed several part-time employees' salaries to a program they did not perform any services for, putting EA at risk of potential compliance issues, including falsifying records. (*See* van Capelle Decl., ¶ 131; Ex. M [EA000782–83].)

### Plaintiff's Requests for Salary Increases

### *Plaintiff's First Request for a Salary Increase*

127.     Plaintiff was offered the Executive Director of CSYD position at EA in the summer of 2018. Immediately after Plaintiff was offered the position, at the inception of Plaintiff's employment, she pushed back on then-supervisor Jonathan Skolnick to increase her salary. (*See* Leone Decl., Ex. 5 [Pl. Tr. 130:7].)

128.     Mr. Skolnick responded that there was "no wiggle room" to increase the salary offered at that time. (*See* Leone Decl., Ex. 5 [Pl. Tr. 131:21–23].)

129.    Plaintiff did not raise any complaint of racial discrimination at this time. (*See* van Capelle Decl., ¶ 106.)

130.    Plaintiff accepted the position as CSYD's Executive Director at a salary of $135,000, but also made clear to Mr. Skolnick that she would be requesting an increase in the future. (*See* Leone Decl., Ex. 5 [Pl. Tr. 132:12-18].)

### *Plaintiff's Second Request for a Salary Increase*

131.    In or about November 2019, Plaintiff again asked for a salary increase. At this time, Ms. Lawrence was Plaintiff's supervisor. Plaintiff verbally asked Ms. Lawrence for a raise. (*See* Leone Decl., Ex. 5 [Pl. Tr. 382:5–7].)

132.    At the time Plaintiff made her second request for a salary increase, she was already serving as both Executive Director of CSYD and Counsel for EA, making her total annual compensation $155,000. (*See* Leone Decl., Ex. 5 [Pl. Tr. 211:17–22]; Leone Decl., Ex. 6 [Desravines Tr. 476:18–24]; van Capelle Decl., ¶ 76.)

133.    Plaintiff did not raise any complaint of racial discrimination at this time. (*See* van Capelle Decl., ¶ 106; ¶ 115; Leone Decl., Ex. 5 [Pl. Tr. 269:10–14].)

134.    Mr. van Capelle, who was aware of Plaintiff's request, told Plaintiff that she could eliminate her Counsel role but still keep her total compensation at $155,000. Plaintiff refused the offer. (*See* Leone Decl., Ex. 5 [Pl. Tr. 272:3–8]; Leone Decl., Ex. 7 [van Capelle Tr. 253:10–20; 155:11-15 (ref. Dep. Ex. 7)].)

135.    Plaintiff testified that she viewed Mr. van Capelle's offer to eliminate her Counsel role and keep her total compensation at $155,000 as punitive. (*See* Leone Decl., Ex. 5 [Pl. Tr. 390:17–391:3].)

136.    At some point between November 2019 and April 2, 2021, Plaintiff spoke with Linda Shemanski, a human resources employee at EA, specifically seeking advice about how to ask for a raise. (*See* Leone Decl., Ex. 5 [Pl. Tr. 388:4–9].)

137.    Plaintiff claims to have also verbally raised the issue about a salary increase during the planning of the annual budget to EA's finance team, but not racial discrimination. (*See* Leone Decl., Ex. 5 [Pl. Tr. 392:8–16].)

### *Plaintiff's Third Request for a Salary Increase*

138.    On April 2, 2021, Plaintiff again requested a salary increase. This time, Plaintiff did so in response to an email thread wherein EA's Senior Budget Analyst, Mohammed Uddin, asked Plaintiff questions related to Plaintiff's budget projections for the 2021 fiscal year. Specifically, Mr. Uddin asked Plaintiff questions regarding her plans to address several grant funding sources that were underspent. In addition to Mr. Uddin, Jill Olonoff (Controller), Carrie Kyle (Grants Compliance Manager), and Stefan Charles (Junior Budget Analyst) were all copied on the email because they were assigned to work with Plaintiff on the CSYD budget. (*See* Leone Decl., Ex. 5 [Pl. Tr. 364:4–11]; van Capelle Decl., ¶¶ 107–108; Ex. I; Desravines Decl. ¶¶ 30–31; Ex. F; Leone Decl., Ex. 7 [van Capelle Tr. 294:3–5].)

139.    When responding to the questions asked by members of the finance team, Plaintiff replied in part that some of the underspent funds were new to her. (*See* Leone Decl., Ex. 5 [Pl. Tr. 366:2–5]; Leone Decl., Ex. 7 [van Capelle Tr. 135:16–136:4]; van Capelle Decl., Ex. I [EA000674]; Desravines Decl., ¶ 32.)

140.    Plaintiff testified that she worked closely with the budget analysts and met with them regularly. (*See* Leone Decl., Ex. 5 [Pl. Tr. 142:5–25].)

141.     Approximately 10 minutes after Plaintiff's email comment that she lacked knowledge of much of the information provided by Mr. Uddin, Plaintiff removed Mr. Charles (the Junior Budget Analyst) from the email thread and proceeded to request a salary increase from the remaining individuals on the thread.  (*See* Leone Decl., Ex. 5 [Pl. Tr. 370:6–11]; Desravines Decl., ¶ 33; Leone Decl., Ex. 7 [van Capelle Tr. 294:3–5].) The email sent by Plaintiff reads:

> Hi Jill,
>
> I hope that you are well! I moved Stefan off of this email.
>
> I have not received a salary increase since joining Ed Alliance and I am interested in receiving pay parity with my counterparts at the agency. I would like to see if an increase can be included retroactively for FY21 to place my salary on par with the other Executive Directors at EA. I do not have a recent number, but guesstimate that would place my annual salary at $155-165k without the role as counsel.

(Desravines Decl., Ex. F [EA0001043-EA001044].)

142.     Plaintiff confirmed that pay parity in the context of this email meant that she "was not being paid consistent with what other people were being paid." (*See* Leone Decl., Ex. 5 [Pl. Tr. 374:7–11].)

143.     All of the individuals on the email thread were from EA's finance team and did not have the authority to give Plaintiff a raise. (*See* van Capelle Decl., ¶ 111; Ex. I [EA000670–76]; Leone Decl., Ex. 7 [van Capelle Tr. 222:25–223:9]; Desravines Decl., ¶ 37.)

144.     Plaintiff testified that she did not know if Ms. Olonoff had the authority to grant her a salary increase. (*See* Leone Decl., Ex. 5 [Pl. Tr. 373:20–24].)

145.     Pay parity, according to Plaintiff, meant that she "would have gotten the same compensation and benefits" as EA's other three Executive Directors. (*See* Leone Decl., Ex. 5 [Pl. Tr. 376:15–22].)

146.    When asked at her deposition whether an annual salary of $180,000 would be considered pay parity, Plaintiff responded "No." When asked why she did not consider this amount to reflect pay parity, she stated that she knew that one of the Executive Directors made $200,000 per year. (*See* Leone Decl., Ex. 5 [Pl. Tr. 377:6–22].)

147.    By her own admission, Plaintiff was not similarly situated "professionally and educationally" to the other executive directors. In fact, the salary increase would be justified, according to Plaintiff, because she had a higher level of education than the other Executive Directors. (*See* Leone Decl., Ex. 5 [Pl. Tr. 378:10–15].)

148.    Plaintiff testified that she does not know whether an individual would need a doctorate degree to perform the duties and functions of Executive Director at CSYD. (*See* Leone Decl., Ex. 5 [Pl. Tr. 386:19–25].)

149.    Plaintiff directed her first two requests for salary increases to her direct supervisors at the relevant times: Mr. Skolnick and Ms. Lawrence, respectively. (*See* Leone Decl., Ex. 5 [Pl. Tr. 387:16–20; 384:19–23]; van Capelle Decl., ¶ 106.)

150.    However, Ms. Lawrence, Plaintiff's direct supervisor at the time of her third request for a raise, was not on the initial email to the finance team on April 2, 2021, and Plaintiff did not think to include her on an email discussion regarding her request for a pay increase. (*See* van Capelle Decl., ¶ 109; Desravines Decl., ¶ 33; Ex. F [EA001042–46]; Leone Decl., Ex. 5 [Pl. Tr. 382:1–17].)

151.    The Controller at the time of Plaintiff's employment, Ms. Olonoff, responded to Plaintiff's third request and stated that she was not the appropriate party to assist Plaintiff in her quest for a raise. Ms. Olonoff suggested that Plaintiff reach out to her direct supervisor, Ms. Lawrence. (*See* van Capelle Decl., ¶ 110; Desravines Decl., ¶ 35.)

152.     Thereafter, Plaintiff forwarded her email thread with the finance team to Ms. Lawrence. It was in this email to Ms. Lawrence (a member of the Executive Team) that Plaintiff first mentioned a concern about pay parity. In the email to Ms. Lawrence, Plaintiff stated that:

> [W]ith the shifts and opportunities with CSYD funding (see email thread below), I wanted to revisit my request for pay parity. We discussed this pre-pandemic (@ November 2019) and you communicated to me that Alan would support me keeping my current salary without the 2nd role as counsel. With the current and foreseeable status of funding for CSYD and the EA's DEI priority, I want to request that my salary for my ED role be increased to be on par with the other Executive Directors at EA retroactive for FY21. I know that there is a range; however bringing me to 160k would make me happy, as it would recognize my efforts, successes, and value to EA. I trust that HR will conduct their audit and analysis to confirm the amount.

(Desravines Decl., Ex. F [EA001042–46].)

153.     However, Plaintiff admitted during her deposition that she does not know whether she ever used the term "pay parity" in her conversation with Ms. Lawrence in November 2019. In fact, Plaintiff stated that the conversation was solely in regards to a salary increase. (*See* Leone Decl., Ex. 5 [Pl. Tr. 387:4–11].)

154.     In addition, in her April 2, 2021 email to Ms. Lawrence, Plaintiff did not identify discrimination of any kind – including but not limited to racial discrimination – as a determinative factor of the alleged pay parity. (*See* van Capelle Decl., ¶ 113; Ex. I; Desravines Decl., ¶ 40; Ex. F.)

155.     In Plaintiff's email to Ms. Lawrence, Plaintiff stated that the underspent budget provided EA with the opportunity to give her a salary increase and "there was funding available" to increase her salary. Plaintiff further pointed to the additional money she had secured for EA through fundraising efforts as another source of funds for a salary bump. (*See* Leone Decl., Ex. 5 [Pl. Tr. 383:3–25; 384:6].)

156.    The Advantage, Arabella, Boys and Girls Club of America, and DYCD grants were all sources, according to Plaintiff, that EA could use to increase her salary. (*See* Leone Decl., Ex. 5 [Pl. Tr. 401:9–12].)

157.    Plaintiff's request for a raise in the midst of Mr. Uddin's inquiry regarding the CSYD budget that Plaintiff managed was confusing, shocking, and peculiar to Mr. van Capelle. It was also confounding because none of the individuals on the email thread had the authority to approve Plaintiff's request for a raise. (*See* van Capelle Decl., ¶ 111; Desravines Decl., ¶ 37; Leone Decl., Ex. 7 [van Capelle Tr. 222-25–223:9].)

**Plaintiff's Allegations of Pay Disparities Based on Race**

158.    On April 15, 2021, Mr. Desravines emailed all of the Executive Directors to receive feedback on a new potential system for salary increases with the subject line "Pilot: Salary Increase Process for FY22 Budget Process." (*See* Desravines Decl., ¶ 55; Leone Decl., Ex. 7 [van Capelle Tr. 234:16–25]; Leone Decl., Ex. 6 [Desravines Tr. (ref. Dep. Ex. 13 [EA0001026-EA001027])].)

159.    Plaintiff did not initially respond to Mr. Desravines April 15, 2021 email, prompting Mr. Desravines to send a follow-up email four days later. (*See* Desravines Decl. ¶ 56; van Capelle Decl., Ex. J [EA000700–02].)

160.    Upon receiving Mr. Desravines follow-up email, Plaintiff replied and stated that: "I think any strategy to systematize increases should be postponed until there is pay equity at EA." (*See* van Capelle Decl., Ex. J [EA000701].)

161.    Plaintiff made her first and only complaint of racial discrimination on April 19, 2021. In her initial request for pay parity on April 2, 2021, there was no mention of any racial discrimination whatsoever. Similarly, during her November 2019 discussion with Ms. Lawrence,

her direct supervisor, Plaintiff did not even mention pay parity, but rather, a "salary increase." (*See* van Capelle Decl., ¶ 115; Desravines Decl., ¶ 58.)

162.   Plaintiff also cannot and did not explain why she did not explicitly state her belief that she was being discriminated against on the basis of her race in the first iteration of her email on April 2, 2021 to the finance team. (*See* Leone Decl., Ex. 5 [Pl. Tr. 416:20–25; 417:7].)

163.   Plaintiff subsequently responded to Mr. Desravines and stated in part that she was "the lowest paid ED and the other 3 are white (2 men, 2 Jewish) who earn considerably more." Plaintiff also stated in her reply email to Mr. Desravines that "at least 50 others in the agency" are not being paid equitably and therefore were being discriminated against based on "gender, race, religion and/or sexual orientation." (*See* Leone Decl., Ex. 5 [Pl. Tr. 435:13–20]; Desravines Decl., Ex. H [EA000700–702].)

164.   At the time of her deposition, Plaintiff was not able to identify the roles and responsibilities of the other three Executive Directors at EA with any reasonable certainty. (*See* Leone Decl., Ex. 5 [Pl. Tr. 524:1–16].)

165.   Plaintiff also did not know with any reasonable certainty what each of the other three Executive Directors' starting salaries were. (*See* Leone Decl., Ex. 5 [Pl. Tr. 377:10–11].)

166.   The April 19, 2021 email was the first time Plaintiff mentioned her belief that at least 50 people at EA were being discriminated against based on gender, race, religion and/or sexual orientation. (*See* van Capelle Decl., ¶ 115; Desravines Decl., ¶ 57; Ex. H.)

167.   When asked at her deposition whether Plaintiff could identify all of the 50 people she represented were being discriminated against based on a protected class, Plaintiff states that she could not. (*See* Leone Decl., Ex. 5 [Pl. Tr. 443:19–23].)

168.     In fact, Plaintiff testified in a hypothetical that if an organization had 100 employees, and 50 of those employees were Black, then the 50 individuals who identified as Black would have been discriminated against, and 50% of the organization would have discriminated against those Black employees. (*See* Leone Decl., Ex. 5 [Pl. Tr. 439:6–10].)

169.     In response to Plaintiff's April 19th email complaint, Mr. Desravines promptly asked Plaintiff to provide the 50 names so that he could perform a thorough analysis and investigation based on Plaintiff's allegations. He also stated that he took Plaintiff's allegations very seriously. (*See* Desravines Decl., ¶ 59; Leone Decl., Ex. 6 [Desravines Tr. 521:14–22]; Leone Decl., Ex. 7 [van Capelle Tr. 282:13–16].)

170.     Plaintiff replied that she supposedly could not provide the names because it was "confidential" and suggested that Mr. Desravines look for the names himself in the ADP system, stating that other business partners could help add clarity. (*See* Leone Decl., Ex. 5 [Pl. Tr. 449:22–450:12; Desravines Decl., ¶ 60; van Capelle Decl., ¶ 117;  Ex. J [EA000700]; Leone Decl., Ex. 6 [Desravines Tr. 521:23–522:9].)

171.     When asked why the names were confidential, Plaintiff could not answer.  (*See* van Capelle Decl., ¶ 60; Leone Decl., Ex. 5 [Pl. Tr. 450:16–451:2]; Leone Decl., Ex. 6 [Desravines Tr. 508:6–9].)

172.     Plaintiff merely stated that it would be easier for Mr. Desravines to pull the names himself. (Id.)

173.     According to Plaintiff, the fact that an employee was Black or non-White and paid less should have been sufficient for Mr. Desravines investigation. (*See* Leone Decl., Ex. 5 [Pl. Tr. 438:19–439:10; 458:8–17].)

174.    Mr. Desravines informed Plaintiff that it would be negligent of both Plaintiff and himself if they did not perform a thorough investigation of all 50 names. (*See* Desravines Decl., Ex. H [EA000700–702].)

175.    Plaintiff testified that she never performed her own analysis or equity review of the 50 people she alleges were discriminated against based on several protected classes. (*See* Leone Decl., Ex. 5 [Pl. Tr. 438:9–18].)

176.    Plaintiff testified that the number 50 was not specific to any group of people, but was instead an anecdotal, symbolic number to highlight EA's alleged pay-parity discrimination issues. (*See* Leone Decl., Ex. 5 [Pl. Tr. 437:7–15].)

177.    Despite her unwillingness to provide the names of the 50 people who were allegedly discriminated against and underpaid, Plaintiff eventually voluntarily worked with Linda Shemanski (Director of Human Resources) to provide some names to Mr. van Capelle. (*See* Leone Decl., Ex. 5 [Pl. Tr. 455:25–456:25].)

178.    In total, Plaintiff identified only 27 individuals. (*See* van Capelle Decl., ¶118; Ex. J [EA000168–171]; Leone Decl., Ex. 6 [Desravines Tr. 507:25–508:2].)

179.    Plaintiff never received permission to provide any names from the alleged employees who were discriminated against. (*See* Leone Decl., Ex. 5 [Pl. Tr. 463:6–10]; Leone Decl., Ex. 7 [van Capelle Tr. 305:19–306:5].)

180.    Mr. van Capelle also asked Plaintiff to provide the 50 names after Plaintiff failed to respond to Mr. Desravines request for the names. (*See* van Capelle Decl., ¶ 117; Ex. J [EA000168–171]; Leone Decl., Ex. 7 [van Capelle Tr. 341:4–5; 306:11–17]; Desravines Decl., ¶ 61.)

181.    To date, Plaintiff has never provided EA with the names of all 50 individuals who Plaintiff alleges were paid disparately on the basis of several protected classes. (*See* Leone Decl., Ex. 5 [Pl. Tr. 443:19–23].)

182.    During her testimony, Plaintiff was unable to identify how each of the 27 individuals on her list was discriminated against. Plaintiff could only state whether they were Black or Brown as a basis for compensation-based discrimination. (*See* Leone Decl., Ex. 5 [Pl. Tr. 458:13–17; 459:3–22].)

183.    Despite Plaintiff's claim that she could point to at least 50 EA employees who were discriminated against based on "religion and/or sexual orientation," EA does not collect data on employees' sexual orientation or religion. (*See* Desravines Decl., ¶ 64; Leone Decl., Ex. 7 [van Capelle Tr. 318:10–16]; Leone Decl., Ex. 6 [Desravines Tr. 424:5–7].)

184.    Despite her claim of compensation-based race discrimination, Plaintiff made it clear in her deposition testimony that "race had nothing to do with [pay] parity. It was people, and the roles they had." (*See* Leone Decl., Ex. 5 [Pl. Tr. 252:17–23].)

### Plaintiff's Termination

185.    Plaintiff was subsequently terminated from EA on May 10, 2021. Mr. van Capelle and Mr. Desravines were present. (*See* Leone Decl., Ex. 5 [Pl. Tr.  497:6–13]; Desravines Decl., ¶ 73; van Capelle Decl., ¶ 123.)

186.    Plaintiff recorded the termination meeting on her cell phone. (*See* Leone Decl., Ex. 5 [Pl. Tr. 497:18–25].)

187.    Plaintiff had never previously recorded Mr. van Capelle or Mr. Desravines in a meeting. (*See* Leone Decl., Ex. 5 [Pl. Tr. 498:4–20].)

31

188.    On the same day, prior to her termination, Plaintiff emailed newly-hired Stefan Charles with just a subject line (nothing in the body of the email) stating: "Needed: Salary comparison for those with an increase from FY'21 to FY'22 - thanks!" (*See* van Capelle Decl., Ex. K [EA001304–307].)

Dated:  New York, New York                    TANNENBAUM HELPERN
        March 31, 2023                        SYRACUSE & HIRSCHTRITT LLP

                                              By:  _Amanda Leone_____
                                                   Jason B. Klimpl, Esq.
                                                   Amanda M. Leone, Esq.
                                                   Janae C. Cummings, Esq.
                                                   900 Third Avenue
                                                   New York, New York 10022
                                                   (212) 508-6700
                                                   klimpl@thsh.com
                                                   leone@thsh.com
                                                   cummings@thsh.com

                                                   *Attorneys for Defendant*