UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
PATRICIA CHARLEMAGNE,                    :
                                        :
                        Plaintiff,       :        22cv1136 (DLC)
                                        :
            -v-                          :        OPINION AND
                                        :        ORDER
THE EDUCATIONAL ALLIANCE, INC.,          :
                                        :
                        Defendant.       :
                                        :
--------------------------------------- X

APPEARANCES:

For plaintiff Patricia Charlemagne:
Michelle A. Caiola
Jonathan Goldhirsch
Phillips & Associates, PLLC
45 Broadway, Ste. 430
New York, NY 10006

For defendant the Educational Alliance, Inc.:
Jason B. Klimpl
Amanda M. Leone
Janae C. Cummings
Tannenbaum Helpern Syracuse & Hirschtritt LLP
900 Third Ave.
New York, NY 10022

DENISE COTE, District Judge:

    Dr. Patricia Charlemagne, an African American woman, is a

former Executive Director at the Educational Alliance, Inc.

("EA"), a non-profit organization.  In this action, Dr.

Charlemagne brings race discrimination and retaliation claims

against EA, asserting that she was not paid fairly relative to

her white colleagues and that her employment was terminated in

retaliation for her complaints of racial discrimination.  EA has moved for summary judgment on all of the plaintiff's claims. For the following reasons, EA's motion for summary judgment on the discrimination claims is granted.  The motion for summary judgment on the retaliation claims is denied.

## Background

The following facts are taken from the evidence submitted in connection with the summary judgment motion.  The facts are undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.

This section begins with an overview of EA's services and structure, as well as a description of the plaintiff's position at EA and how it relates to other key positions with the same title.  It then presents a chronology of events giving rise to the plaintiff's claims.

I.   Overview of EA's Services and the Plaintiff's Position

EA is a non-profit organization that serves children and families in the Lower East Side and East Village neighborhoods of Manhattan.  EA provides educational, cultural, health, wellness, and social services to its community.  It operates three community centers with physical, brick-and-mortar locations –– the Manny Cantor Center ("MCC"), the Central for Recovery and Wellness ("CRW"), and the 14th Street Y.

Additionally, EA runs a school enrichment program for several local elementary and middle schools called Community Schools and Youth Development ("CSYD"). CSYD operates out of the schools it serves, rather than out of a separate facility.

During the plaintiff's employment at EA, each of the three community centers and the CSYD program was overseen by an Executive Director. To provide context for the plaintiff's claim that she was not paid fairly, the next several sections describe the three community centers and CSYD, as well as the Executive Director roles for each of these programs.

A.   The Manny Cantor Center

The MCC is a physical community center. It operates seven days a week and provides several programs and facilities, including an art school, a family resource center, a teen center, and a fitness center. MCC offers tuition-based preschool, infant, and toddler care, along with services for older adults. It also offers fee-for-service programs that require participants to pay for the services, which earns money for the center. In addition, community members can rent space in MCC for special events. Finally, MCC serves as EA's headquarters location and houses the office space for many of EA's full-time staff. From 2020 to 2021, MCC's budget was over $14 million.

3

During the plaintiff's employment with EA, MCC's Executive Director was a white woman.  In addition to overseeing MCC's various programs, the MCC Executive Director also supervises building operations and maintenance.

The individual who worked as MCC's Executive Director in the relevant times began working at EA in August 2012 at a salary of $150,000.  She received her first salary adjustment after four years of working at EA and did not receive any salary increase from 2019 to 2021 due to the COVID-19 pandemic.  At the time of the plaintiff's employment, the MCC Executive Director's salary was close to $185,000.

B.   The Center for Recovery and Wellness

CRW is another of EA's physical community centers.  CRW provides services for people with substance abuse problems, outpatient and residential addiction treatment, and other addiction recovery services.  It includes a residential treatment facility that is open all day, seven days a week. From 2020 to 2021, CRW's budget was almost $10 million.

During the plaintiff's employment, CRW's Executive Director position was held by a white man.  The CRW Executive Director supervises the center's substance abuse services and a community food program.  Additionally, CRW's Executive Director must obtain an addiction specialist certification and ensure that the

rest of the CRW staff receives similar certifications as
necessary.  Finally, like the Executive Director of MCC, the
Executive Director of CRW supervises building operations and
maintenance.

The individual who held the CRW Executive Director position
began working at EA in May 2016 at a salary of $130,000.  He
received his first salary increase after one year of employment,
which EA contends was commensurate with his credentials,
including reaching the highest level of a certain certification
relevant to CRW's services.  He did not receive a salary
adjustment from 2019 to 2021 due to COVID-19.  During the
plaintiff's employment, the CRW Executive Director's salary was
over $150,000.

C.   The 14th Street Y

The 14th Street Y is EA's third physical community center.
The 14th Street Y offers health and wellness facilities and
education, arts, cultural, and enrichment programs.  This center
provides many fee-for-service programs, including swimming
lessons, parenting classes, theatre productions, and a summer
camp on Staten Island for roughly 1,000 students.  The summer
camp must generate over $3 million in revenue for the center.

From 2020 to 2021, the 14th Street Y's budget was almost $6 million.[1]

During most of the plaintiff's employment at EA, a white man served as the Executive Director of the 14th Street Y.  The Executive Director of the 14th Street Y oversees the center's programming, advertises and promotes the summer camp, and supervises building operations and maintenance.

The individual who held this role during the majority of the plaintiff's time at EA began working at EA as an Associate Executive Director in September 2015, with a salary of $130,000. He received his first salary increase after three years of work at EA and did not receive a salary increase from 2019 to 2021 due to COVID-19.  At the time of plaintiff's employment, the 14th Street Y Executive Director's salary was $195,000.

D.   The Community Schools and Youth Development Program

1.   Program Description

The CSYD program provides educational enrichment programs for elementary and middle school students during and after school days, on weekends, and in the summer months.  During Dr. Charlemagne's employment at EA, the program served almost 2,000 students across several schools housed in four physical

---

[1] The budget was lower than in prior years due to COVID-19.  For example, from 2018 to 2019, the budget was over $11 million.

locations located in Manhattan's Lower East Side neighborhood --
P.S. 142, P.S./M.S. 140, P.S./M.S. 188, Tompkins Square Middle
School, and P.S. 64 (together, the "Schools").  Because the CSYD
program physically operates out of the Schools, it does not have
its own standalone building, unlike the three community centers.

The CSYD program primarily serves students of color, many
of whom are not meeting proficiency standards in English or
math.  Many of the students live in public housing or shelters
and lack access to technology, school supplies, nutritious
meals, and other essentials.  During the pandemic, the CSYD
continued its operations and further assisted families through
services like wellness check-ins and a food pantry at one of the
Schools that served over 900 families.

2.   The CSYD Executive Director

While employed at EA, the plaintiff served as the Executive
Director of the CSYD program.  The Executive Director of CSYD
oversees the services that CSYD provides to the Schools.  Unlike
the Executive Directors of the three community centers, the
Executive Director of the CSYD program does not oversee any fee-
for-service programs; does not regularly work weekends or
nights; does not supervise any programs that run all day, every
day; does not oversee any programs for the elderly; and does not
oversee the operations or maintenance of a physical building.

7

Unlike the Executive Director of the CRW, the Executive Director of the CSYD program does not require any special certifications. The Executive Director of CSYD is not required to engage in fundraising efforts for the program or oversee any revenue-generating programs.

Certain responsibilities of the CSYD Executive Director are relevant as they bear on the defendant's proffered reasons for terminating the plaintiff's employment, which are addressed below.  Those responsibilities include the Executive Director's role in managing the CSYD's budget, her role in cultivating and maintaining relationships with the principals of the Schools, and her role in managing the program's staff.

The CSYD program is funded through grants offered by government agencies and private foundations.  During the plaintiff's employment, these funding sources included (among others) the New York City Department of Education's Department of Youth and Child Development ("DYCD"), as well as private foundations.  For at least some of CSYD's funding sources, if the funds were not used in accordance with the grant's terms and conditions, or if the funds were underspent, EA risked losing the funding.  The responsibilities listed in the plaintiff's written job description included in relevant part: "design, manage and take overall responsibility for developing program

budgets that align to program goals" and "work with finance and program leaders to monitor expenditures, ensure accountability, and oversee budget tracking and reporting to ensure responsible, and on budget, fiscal management of programs and contracts."

Another responsibility the plaintiff had as Executive Director was developing and maintaining relationships with the School principals.  According to the plaintiff, she had a good relationship with at least one of the principals, but relationships with other principals were "average" or "hot and cold."

Finally, as Executive Director, plaintiff also had a role in managing CSYD's staff.  The program had approximately 200 to 300 part-time employees, and the plaintiff led around ten to fifteen full-time direct reports.  The plaintiff played a role in hiring her direct reports and had "limited responsibilities" relating to hiring part-time staff.  The plaintiff also supervised the CSYD staff to ensure the program was maximizing the talent of its employees and spearheaded professional development programs.

The plaintiff's salary for her Executive Director role was $135,000.  During her employment, which lasted from September 2018 to May 2021, this salary never increased.  Executive Director salaries are based on various factors including the

Executive Director's tenure and experience, the number of programs under their supervision, the demographics served by those programs, the operating hours of the programs, whether the programs operated out of a physical building, whether the programs had fee-for-service offerings, whether the Executive Director was responsible for fundraising, and the salary of the last individual in that position.  The plaintiff's predecessor in the CSYD role was also an African American woman and, like the plaintiff, was paid less than the other Executive Directors. After the plaintiff was fired, her successor, another African American woman, had an annual salary lower than other Executive Directors at just under $140,000.

II.  Chronology of Key Events

    A.    The Plaintiff Begins Work at EA.

    The plaintiff joined EA on or around September 12, 2018. Her offer letter listed her position as the "Executive Director of Community Schools and Youth Development at [the] Manny Cantor Center."  The letter noted that the plaintiff's annual salary would be $135,000.00.  When plaintiff was given the offer, she asked for more money from her would-be supervisor, but he told her there was "no wiggle room" in the budget.  She accepted the offer anyway.

Shortly after the plaintiff was hired, EA's Executive Vice President ("EVP") of Programs died.  In November or December of 2018, the plaintiff expressed an interest in the role to Alan van Capelle, EA's President and CEO at the time.[2]  The plaintiff did not apply for the role, and Donna Lawrence, a white woman, took the role instead.  Lawrence became the plaintiff's supervisor.

On December 18, van Capelle sent an email to all of EA's staff informing them that EA had retained a consultant, "Onward," to review and report on diversity and equity within the organization.  In January 2019, he sent a follow-up to this email to address an incident in which "a colleague posted a sign on the 4th floor refrigerator [that] intended to ask colleagues to clean up after themselves" but did so "through a depiction of Martin Luther King in a spirit that made light of his life's work."  In this email, van Capelle reminded EA staff to "communicate with respect for our colleagues and in ways that celebrate each other's identities, cultures, and histories."

Also in early 2019, a new "of counsel" role was created at EA.  The plaintiff, who has a law degree, took on the role of

---

[2] Van Capelle self-identifies as a "gay man of color," whose father was born in Indonesia and whose mother is of Eastern European descent.

"Counsel," in addition to her continuing responsibilities as Executive Director of CSYD.  This role required only a few additional hours of work, which mostly entailed reviewing contracts.  Plaintiff received an additional $20,000 for her role as Counsel, bringing her total annual salary to $155,000.

B.    The Plaintiff Requests a New Office.

At some point in 2019, the plaintiff requested that EA relocate her office.  Because the CSYD program did not have a brick-and-mortar location, the plaintiff's office was in the MCC building.  When she started, her office was on an underground level of the building, two floors below ground level.  There were two other individuals who worked there -- the director of the teen center at the MCC, who was African American, and an individual who handled marketing for the MCC, who was white.

The plaintiff asked to relocate to the fourth floor of the building, where EA's Executive Team sat.[3]  Van Capelle disagreed with the plaintiff over whether, given the plaintiff's responsibilities, it made sense to put her office on the fourth floor.  The plaintiff claims that she informed van Capelle that she felt that her assignment to the lower level was racially

---

[3] The Executive Directors were not part of the Executive Team. Instead, that team included EA's President and CEO van Capelle, EA's EVP Lawrence, EA's Chief Financial Officer, and, after he was hired in 2021, EA's Chief People and Equity Officer Jean Desravines.

motivated.  Ultimately, her request was denied.[4]  Several months later, during the COVID-19 pandemic, the plaintiff's office was relocated to the second floor of the MCC building after her basement office flooded.

### C.  School Principals Complain, and the Plaintiff Seeks a Pay Increase.

On July 30, 2019, one of the principals of the Schools served by the CSYD program emailed van Capelle on behalf of herself and other principals complaining of changes in the CSYD program over the past year.  Her email read in part:

> This past year there were a number of changes within your company and we believe this has had a reverberating effect on our collaboration and communication.  The lack of communication this year cannot be overstated.  Changes that directly affect our community school budget were made without our knowledge or our consent.  Shifts in staff and leadership . . . were made without discussion. . . . The manner in which this was done feels deceptive and not inclusive.  There is a lack of awareness I feel that your new leadership is portraying and has, I believe, made me concerned about the future of our relationship -- which is saddening as I have always held EA as a great supporter and cheerleader for all our families.

After this email, three other principals met with van Capelle and Lawrence (the plaintiff's supervisor) to discuss concerns over communication with EA and changes that the

---

[4] The plaintiff does not argue that her retaliation claims are based on this request to relocate her office.  Instead, they are based on the plaintiff's requests in 2021 for an increase in salary.

plaintiff was implementing in the Schools' CSYD programming. According to the defendant, during this meeting, the principals asked van Capelle to fire the plaintiff because they thought she was not being collaborative and was making decisions in a way that negatively affected the Schools.  Van Capelle did not fire the plaintiff but provided her with feedback on her management style and communication with the principals.

In the summer of 2019, Onward delivered its report on regarding diversity, equity, and inclusion ("DEI") at EA.  At some point in 2019, EA also engaged Community Resource Exchange ("CRE") to assist with structuring EA's human resources ("HR") department.  CRE's report was delivered in August 2019.[5]

In late 2019, the plaintiff made a request for a pay increase at EA.  At some point that year, the plaintiff was looking through a payroll dashboard for her staff when she noticed other EA employees' salaries appearing on the screen. She saw that a white man who worked as the Associate Vice

---

[5] The plaintiff relies heavily on the contents of the reports by Onward and CRE to show the existence of racial discrimination at EA.  She similarly relies on notes, evidently created by CRE, from interviews between CRE and EA employees to help prove the same.  These documents are inadmissible hearsay.  Because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (citation omitted), the contents of these reports and interviews are not described here.

President of EA's "Head Start" program was earning more than she was.  She also saw that an African American woman who had worked at EA for over 30 years and who was in charge of older adult services was earning less than this Associate Vice President.

Based on this and other information, in late 2019, the plaintiff reached out to EA's human resources ("HR") department to request a pay increase.  The plaintiff asserts that she told the HR department that she felt she was not being paid fairly because of her race.  An HR representative gave the plaintiff advice about requesting a raise.  After this conversation, the plaintiff spoke with Lawrence and requested a raise.  The plaintiff does not assert that she told Lawrence that she felt she was being discriminated against on the basis of race or any other protected characteristic.  Lawrence denied the plaintiff's request for a raise.  Later in 2019, however, van Capelle offered to remove the plaintiff's second role as Counsel but retain her $155,000 combined salary -- that is, to receive $155,000 to serve only as Executive Director.  The plaintiff declined this offer.[6]

---

[6] The plaintiff's retaliation claims are not based on this 2019 request for a raise and are instead based on later requests made in 2021.

D.   The Plaintiff Alerts Lawrence to Staffing Issues and
     Purportedly Triggering Language in a Draft Proposal.

In 2020, certain of CSYD's programs began experiencing low
in-person attendance, which was attributed to COVID-19.  Also in
2020, the programs experienced staffing issues, which were
purportedly worsened by the pandemic.  During this time, the
programs under the CSYD umbrella sent Lawrence weekly reports on
student participation and enrollment data, as well as regular
reports on staffing ratios.

On September 29, 2020, the plaintiff sent an email to
Lawrence, which was forwarded to van Capelle, stating that
CSYD's programs were "currently understaffed" for certain roles.
Both Lawrence and van Capelle responded seeking to set up a time
to discuss the understaffing issue further.  It is unclear from
the record if the meeting was ever held.

On October 7, Lawrence emailed the plaintiff seeking her
input on a proposal for renewing one of CSYD's grants and a
portion of the budget set aside for a training program.  The
plaintiff responded the next day explaining at length her view
that certain language in the proposal was "triggering" and would
"be more harmful than helpful in a proposal to funders."

Lawrence replied a few hours later, taking issue with the
plaintiff's "very condescending tone" and stating that the
plaintiff's email was "perhaps the most glaring example" of the

16

plaintiff treating Lawrence in a "patronizing" way.  Regarding
the content of the plaintiff's email, Lawrence stated that she
did not know why the language in question was triggering and
would be hurtful in a proposal to funders.

Lawrence later forwarded this entire email chain to another
employee at EA.  When forwarding the chain, Lawrence stated that
the plaintiff "is the most manipulative and self-serving
person...ugh."  In response, the other employee agreed with
Lawrence about the relevant language in the proposal and
commented that the plaintiff's "arrogance blinds her to seeing
how condescending she comes off.  You're not wrong!  Don't back
down.  GRRRR."

E.   The Plaintiff Requests a Raise and Accuses EA of
     Discriminatory Conduct.

1.   The Plaintiff's April 2, 2021 Request

In January 2021, in connection with the work done with
Onward regarding DEI, EA created a new position, Chief People
and Equity Officer.  When EA began its search for the role,
there were some initial discussions that the plaintiff might
fill the role, but she ultimately did not apply.  Instead, Jean
Desravines, an African American man, was hired to fill the role
in January 2021.

On April 2, 2021, one of EA's Budget Analysts emailed the
plaintiff and a Junior Budget Analyst, copying EA's Controller

17

and EA's Grants Compliance Manager.  In his email, the Budget
Analyst listed several questions relating to the CSYD budget,
including questions about how EA intended to spend multiple
underspent grant funds.  The plaintiff responded with some
"preliminary thoughts" roughly 30 minutes later.

Less than ten minutes after this initial response, the
plaintiff sent another email within this chain to the
Controller, copying the Budget Analyst and Grants Compliance
Manager but removing the Junior Budget Analyst from the chain.
This email stated:

> I have not received a salary increase since joining Ed
> Alliance and I am interested in receiving pay parity
> with my counterparts at the agency.  I would like to
> see if an increase can be included retroactively for
> FY21 to place my salary on par with the other
> Executive Directors at EA.  I do not have a recent
> number, but guesstimate that would place my annual
> salary at 155-165k annually without the role as
> counsel.

(Emphases supplied.)  In this email, the plaintiff also included
a revised version of the budget proposal and projections for
2021 that reflected an increased salary for the plaintiff.

EA's Controller responded roughly 30 minutes later that "we
are not the parties to speak to about parity or increases when
it concerns other departments."  The Controller told the
plaintiff that she "should speak to Donna [Lawrence] (as your

direct supervisor) and Jean [Desravines, the Chief People and
Equity Officer,] in terms of parity."

Accordingly, roughly 20 minutes later, the plaintiff
forwarded the entire email chain to Lawrence.  The plaintiff's
email to Lawrence stated:

> Hi Donna,
>
> I hope that you are well.
>
> With the shifts and opportunities with CSYD funding
> (see the email thread below), I wanted to <u>revisit my
> request for pay parity</u>.  We discussed this pre-
> pandemic (@ November 2019) and you communicated to me
> that Alan [van Capelle] would support me keeping my
> current salary without the 2nd role as counsel.
>
> With the current and foreseeable status of funding for
> CSYD and the EA's <u>DEI priority</u>, I want to request that
> my salary for my ED role be increased to be on par
> with the other Executive Directors at EA retroactive
> for FY21.  I know that there is a range; however
> bringing me to 160k would make me happy, as it would
> recognize my efforts, successes, and value to EA.  I
> trust that HR will conduct their audit and analysis to
> confirm the amount.
>
> Please let me know your thoughts and the next steps.

(Emphases supplied.)

> 2.   The Executive Team Responds to the Plaintiff's
>      April 2 Request.

About two hours after the plaintiff emailed Lawrence, EA's
Chief Financial Officer ("CFO") forwarded the original email
chain to several other EA employees.  In his email, the CFO
stated that he and the Controller "thought you could all use
some amusement for the weekend," and then summarized the

circumstances of the plaintiff's request, including that she made the request from the finance team in response to an email about budgeting.  EA employees responded with amusement.  One replied, "Dying right now!  DYING!!"  Another said, "This is a true classic...."  Van Capelle replied to the chain, "Exactly what I needed today!  Hilarious."

The following Monday, April 5, EA's Executive Team had a meeting, in which one topic of discussion was the plaintiff's request for a salary increase.  The notes from the meeting indicate that the team discussed that the plaintiff was "pushing for pay parity with her counterparts at the agency" and "seeking a retroactive raise."  The notes state that Lawrence "expressed concern about [the plaintiff] pushing the 'equity' issue, making this a legal matter."  The notes also indicate that "Donna [Lawrence] and Alan [van Capelle] have plans to call some of [the plaintiff's] staff, including school principals to get a better understanding of what exactly is going on at CSYD."  Finally, the notes explain that the Executive Team's "consensus was that [the plaintiff] needs to be written up for this behavior" and that Desravines would "draft the written warning."

On April 7, Desravines emailed Lawrence about the plaintiff's request, noting that the plaintiff "raises the other EDs as peers and identical salary matches."  He also explained

that based on information from salary.com, the plaintiff's
salary was "not necessarily out of whack" but cautioned that the
source was "not the best tool" for evaluating the issue.
Accordingly, he asked Lawrence about the plaintiff's
responsibilities relative to those of the other Executive
Directors so that EA could try to determine "if we have any
internal equity matter that needs to be addressed."

On April 8, the Executive Team held another meeting, during
which the plaintiff's request was discussed.  The notes from
this meeting stated in part:

- Pat [Charlemagne] is earning an additional
  $20,000 per year for her legal work at EA, a
  factor she did not consider when A. listing her
  base salary and B. requesting a raise.

- Jean [Desravines] said Pat is paid less than an
  Associate Executive Director such as Howard, and
  perhaps we should look at how this might make Pat
  feel.  How can we justify giving Howard, an Assoc
  ED more money than an ED such as Pat?

- Alan [van Capelle] responded that money earned
  for her work as legal counsel plus her regular
  salary puts her on a par with Howard.

(Emphases supplied.)  The notes also outlined the team's early
plans to address the "perception of inequity across the agency
with respect to raises."  Finally, the notes stated that
Desravines was still "working on a memo outlining Pat's
unprofessional, erratic behavior" in asking for a raise from

members of the finance team, rather than from Lawrence and
Desravines directly.

On April 9, Lawrence replied to the plaintiff's April 2
email requesting a salary increase.  In this reply, she told the
plaintiff that "all salary requests will be considered as part
of the FY22 budget process" and that she had shared the email
with Desravines "and one of us will get back to you as soon as
[we] have a response."

After he received the request for pay parity, Desravines
conducted a pay parity analysis by comparing the plaintiff's
responsibilities to those of others with the same title.  During
this review, he noted certain differences between the
plaintiff's position and the other Executive Director roles,
including the lack of a permanent physical facility for the
plaintiff to manage, the lack of a requirement that plaintiff
receive special certifications, and the lack of expectation that
the plaintiff generate revenue for the program.  Desravines also
evaluated the plaintiff's salary by looking at a settlement
house survey,[7] which purportedly revealed that the plaintiff's
salary was on par or higher than the salaries of others
performing similar roles in other organizations.

---

[7] Settlement houses are a network of non-profit, community-based
organizations that share information and resources, including
data relating to employee salaries.

22

On April 15, Desravines emailed the Executive Directors
setting forth a new procedure for requesting raises and cost-of-
living adjustments.  The goal of this procedure, according to
Desravines, was to "look[] at these [salary] requests in an
equitable, constant and transparent way."  Desravines requested
feedback from the Executive Directors on draft documents he had
created in connection with this new procedure.

Later that morning, the plaintiff responded to Desravines's
email noting that she was "looking forward to discussing the Pay
Equity requests that I have made" and that these requests were
"separate and distinctive from the issues and processes
outlined" in Desravines's email on the new procedure.
Desravines replied the following day stating that the "salary
increase process is intrinsically linked to the issue of equity"
and that he was reviewing the plaintiff's request with Lawrence
and would get back to the plaintiff as soon as possible.

            3.    The Plaintiff Reiterates Her Request on April 19.

Desravines sent a follow-up email to the plaintiff on April
19, seeking any feedback on the draft forms he had created.  The
plaintiff responded a few minutes later, stating that there were
"a few benefits" to the proposal, but also sharing two of her
"biggest concerns."  One concern identified by the plaintiff was
as follows:

> I think that any strategy to systematize increases should be postponed until there is pay equity at EA. Again, implementing a process for increases when the starting point is not equitable perpetuates the inequities and presents a major risk to the agency. <u>I am the lowest paid ED and the other 3 are white (2 men, 2 Jewish) who earn considerably more</u>. Even the newest ED (Jordan) makes more than I do. My work and accomplishments at EA have been exceptional, although that is irrelevant when it comes to ph [sic] equity. <u>There are at least 50 others at the agency who are not being paid equitably and can point to gender, race, religion, and/or sexual orientation as being the notable difference</u> between themselves and their higher paid peer. This is a huge problem that you can lead to fix because it's the right thing to do and it is an [sic] clear action step to augment and prioritize DEI at EA. Salaries should be evaluated for fairness and equity across all EA departments before any increases are implemented.

(Emphases supplied.)

Desravines responded on April 21. His response informed the plaintiff that "Donna and I are taking your request seriously and conducting a thorough review of your salary." Regarding the plaintiff's allegations of more systemic problems at EA, Desravaines stated:

> First, as of right now, the Alliance has about 500 staffers, so 50 people would account for about 10% of our population. As a manager/senior leader and our of-Counsel, you understand that you have raised an allegation that I must look into! <u>Please provide me the names of the 50 staffers</u> as we take these matters and allegations very seriously. Thank you so much for bringing this matter to my attention. I look forward to getting the 50 names from you so we can conduct a thorough look into each and every one of those staffers' salary.

24

(Emphasis suppled.)   The plaintiff exchanged emails with
Desravines that evening and declined to provide a list of 50
names, citing confidentiality concerns and telling Desravines
that he could look up the relevant information in EA's records.

On April 22, the plaintiff also responded with a list of 27
names of individuals who she felt were paid unfairly for
discriminatory reasons.   The list included three "BIPOC Women at
the ED/VP Levels" (including herself) and 24 "Others."
Desravines conducted an analysis of the 27 employees and
concluded that, in his view, there were no problems with the 27
employees' salaries.   He communicated this to van Capelle on
April 28.

F.   The Plaintiff's Work Following Her Requests for a
     Salary Increase

On April 21, shortly before Desravines responded to the
plaintiff's email asserting that there were several individuals
at EA who were not being paid fairly, the plaintiff sent an
email to Lawrence with no body text, but with a subject line
that read, "Based on performance, Mayor will be visiting our 142
DYCD Program -- details will follow."[8]   That day and the
following day, Lawrence and the plaintiff exchanged additional
emails, with the Executive Team copied, so that Lawrence could

---

[8] As noted above, DYCD was one of the funding programs under the
umbrella of CSYD.

"get a better understanding of the genesis and purpose" of the visit.  The plaintiff explained that the Mayor and Chancellor were "confirmed for a site visit" of one of the programs at P.S. 142 at 7:45 a.m. and that "DYCD [was] still working on scheduling an afternoon visit."

In light of this email, van Capelle reached out to the principal of P.S. 142 to ask about the Mayor's scheduled visit. The principal stated that the visit did not concern the CSYD program and that the CSYD programming at the school was struggling.  The principal stated that the program had understaffing problems and complained about an expensive holiday party thrown by the plaintiff.  Based on this conversation, van Capelle reached out to other principals who expressed that the programs at their schools were having similar problems.

On April 25, Lawrence emailed the plaintiff about an error that had arisen with some of the funds from DYCD.  The two exchanged emails on the issue from April 25 to 27, and Lawrence asked the plaintiff to identify who was responsible for the mistake.  The plaintiff stated that, "[a]s ED of the department, I will accept full responsibility for the error," but she evidently did not identify to Lawrence the employee responsible for the mistake.

G.    The Plaintiff's Termination and Subsequent Events

On May 10, the plaintiff met with Lawrence, Desravines, and van Capelle over a virtual meeting platform.  At the meeting, van Capelle reviewed with the plaintiff EA's determination that she was paid fairly and that the other 26 individuals she had identified were also paid fairly.  Finally, van Capelle informed the plaintiff that her employment at EA was terminated effective immediately.

Prior to the meeting, Desravines drafted talking points for the meeting.  These talking points listed some justifications for the termination.  The justifications included: (1) that the plaintiff had been unclear in explaining the Mayor's visit to P.S. 142, and that the visit was not actually related the performance of CSYD's programs at that school; (2) that EA's Executive Team had learned, purportedly for the first time, that P.S. 142 and other schools had staffing issues; (3) that several of the principals had asked van Capelle to fire the plaintiff in 2019; (4) that the plaintiff had used funds to throw a "lavish" holiday party in 2019; and (5) that the plaintiff had proposed professional development programs to spend down budget funds, rather than programming for students.

After the plaintiff was fired, Lawrence approached CSYD team members to gather information about the plaintiff's job

27

performance.  Emails sent in the weeks following the plaintiff's departure indicate that EA employees found additional, significant budget errors relating to the plaintiff's work with CSYD.

Finally, many months after the plaintiff's departure, on August 25, 2022, the plaintiff's replacement complained to Desravines that she felt she was not paid fairly on account of her race and gender.  The plaintiff's replacement is also an African American woman.

III. Procedural History

Dr. Charlemagne filed this action against EA on February 9, 2022.  On April 8, the plaintiff sought leave to file an amended complaint to address the defendant's concerns that the initial complaint contained information protected by the attorney-client privilege.  On April 13, the defendant sought to: (1) seal the original complaint and a redline that the plaintiff had filed comparing the original complaint and the proposed amended complaint, and (2) redact portions of the proposed amended complaint.  In an Opinion and Order of May 5, the plaintiff's request to amend her complaint was granted, and the defendant's sealing and redaction requests were denied.  Charlemagne v. Educ. All., Inc., No. 22-CV-1136 (VSB), 2022 WL 1421480 (S.D.N.Y. May 5, 2022).  The plaintiff filed her amended

complaint on May 6, and the defendant answered the amended complaint on May 17.

The case was reassigned to this Court on August 17, 2022. On November 4, a pretrial conference was held to set a schedule for the further conduct of the litigation and to address several discovery disputes that had arisen between the parties. The Court granted the plaintiff's requests to the extent of requiring EA to produce documents showing complaints of race discrimination made by EA employees from September 2018 through the filing of the complaint and documents to identify any parties thrown by EA from September 2018 to the filing of the lawsuit that had a cost comparable to the party thrown by the plaintiff. The Court denied the plaintiff's requests for "separation documents" relating to van Capelle's and Lawrence's departures and for emails regarding EA programs with staffing problems. Most of the plaintiff's remaining requests were mooted by the defendant's representations that it had already produced the relevant documents and was not withholding any additional materials.[9]

---

[9] The defendant also made certain discovery requests at this conference, which were largely granted or mooted by the plaintiff's representation that she had already produced the relevant documents.

Another conference was held in this litigation on February 10, 2023 to address additional discovery disputes. At this conference, the Court granted the plaintiff's request to depose EA's CFO but limited the deposition to two hours. The Court also granted the plaintiff's request that the defendant produce an internal complaint of discrimination made by the plaintiff's successor after this lawsuit was filed, but permitted the defendant to redact portions of that complaint that were irrelevant to a purported pay disparity at EA.[10]

On March 16, after the defendant had produced the redacted complaint from the plaintiff's successor, the plaintiff asked to see an unredacted version of the complaint and to take additional depositions. The plaintiff's March 16 requests were denied on March 20.

On March 31, the defendant moved for summary judgment. The plaintiff filed her opposition to the motion on April 22, and the motion was fully submitted on May 5.[11]

_____

[10] The defendant also represented at this February 10 conference that it agreed to a third request from the plaintiff, namely, that the defendant produce any documents reflecting any additional compensation that the Executive Directors received beyond their annual salary.

[11] On May 18, the plaintiff submitted a letter seeking additional discovery and the opportunity to submit a sur-reply, and requesting that the Court defer decision on the motion for summary judgment. The defendant opposed the request on May 22. On May 23, the plaintiff's May 18 letter request was denied.

## Discussion

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).

In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted). In the context of employment discrimination, "an extra measure of caution is merited" in granting summary judgment because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see

31

also <u>Walsh v. N.Y.C. Hous. Auth.</u>, 828 F.3d 70, 74 (2d Cir. 2016).  Nonetheless, "[e]ven in the discrimination context a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 170 (2d Cir. 2014) (citation omitted).

The plaintiff brings eight claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u> ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 290 <u>et seq.</u> ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 <u>et seq.</u> ("NYCHRL"); and 42 U.S.C. § 1981 ("§ 1981").  She asserts, under each of these statutes, that she was discriminated on the basis of her race because she was not paid fairly relative to her white counterparts.  She also brings retaliation claims under each of the statutes, arguing that she was wrongfully terminated in retaliation for her efforts in April 2021 to seek equal pay.  Each of the plaintiff's claims is addressed below.

I.   Discrimination

A.   Legal Standards

Title VII makes it unlawful for an employer to "fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

32

individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e-2(a)(1).  Claims brought under Title VII are
analyzed using "the familiar burden-shifting scheme" adopted by
the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973).  Walsh, 828 F.3d at 74-75.  To establish a prima
facie case of discrimination, a plaintiff need only demonstrate:
"(1) that she is a member of a protected class, (2) that she was
qualified for the position . . . , (3) that she suffered an
adverse employment action, and (4) can sustain a minimal burden
of showing facts suggesting an inference of discriminatory
motivation."  Littlejohn v. City of New York, 795 F.3d 297, 311
(2d Cir. 2015).

   Under Title VII, it suffices "to show that the motive to
discriminate was one of the employer's motives, even if the
employer had other, lawful motives that were causative of the
employer's decision."  Lenzi v. Systemax, Inc., 944 F.3d 97, 107
(2d Cir. 2019) (citation omitted).  A plaintiff may establish an
inference of discriminatory intent through various kinds of
direct and circumstantial evidence.  Radwan v. Manuel, 55 F.4th
101, 132 (2d Cir. 2022).  For example, such an inference can
arise based on an "employer's criticism of the plaintiff's
performance in ethnically degrading terms" or an employer's
"invidious comments about others in the employee's protected

group." Littlejohn, 795 F.3d at 312 (citation omitted).  It can
also arise where the plaintiff shows disparate treatment among
comparable employees who are "similarly situated to the
plaintiff in all material respects." Radwan, 55 F.4th at 132.[12]

"If the plaintiff establishes a prima facie case, a
presumption of discriminatory intent arises and the burden
shifts to the employer to articulate a legitimate, non-
discriminatory reason for its policy or action." Lenzi, 944
F.3d at 107 (citation omitted).  "If the employer puts forth a
legitimate, non-discriminatory justification, the presumption
drops out of the analysis and the plaintiff must establish, by a
preponderance of the evidence, that the employer's justification
is a pretext for discrimination." Id. at 107-08 (citation
omitted).

Claims of employment discrimination under § 1981 are
analyzed using the same burden-shifting framework as those under
Title VII.  Garcia v. Hartford Police Dep't, 706 F.3d 120, 127
(2d Cir. 2013).  Under § 1981, however, a plaintiff must
demonstrate that "race was a but-for cause of [her] injury."

---

[12] Contrary to the defendant's argument, "a Title VII plaintiff
alleging a discriminatory compensation practice need not
establish that she performed equal work for unequal pay."
Lenzi, 944 F.3d at 110.  Such comparator evidence, however, is
one way (albeit not the only way) for a plaintiff to satisfy the
requirement of establishing an inference of discriminatory
motive.  See Radwan, 55 F.4th at 132.

Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 140 S. Ct. 1009, 1014 (2020).

Discrimination claims brought under the NYCHRL and NYSHRL are also analyzed using the same basic framework as Title VII claims. Lenzi, 944 F.3d at 107 n.7 (NYSHRL); Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) (NYCHRL). Claims brought under the NYCHRL, however, "must be reviewed independently from and more liberally than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted). The NYCHRL does not require that a plaintiff prove an adverse employment action. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 114 (2d Cir. 2013). Rather, "the plaintiff need only show differential treatment -- that she is treated 'less well' -- because of a discriminatory intent." Id. at 110. Nonetheless, "district courts must be mindful that the NYCHRL is not a general civility code." Id. (citation omitted). Accordingly, the plaintiff "still bears the burden of showing that the conduct is caused by a discriminatory motive." Id.

The NYSHRL was amended, effective August 12, 2019. See 2019 N.Y. Sess. Laws ch. 160. As amended, the NYSHRL must be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights

35

laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300 (2023). "While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, courts in this District have interpreted the amendment as rendering the standard for claims closer to the standard of the NYCHRL." Kaye v. N.Y.C. Health & Hosps. Corp., No. 18 Civ. 12137 (JPC)(JLC), 2023 WL 2745556, at *17 (S.D.N.Y. Mar. 31, 2023) (citation omitted).

B.   Analysis

The parties appear to agree for the purposes of this motion that three of the four elements of the plaintiff's prima facie case of discrimination are met -- the plaintiff belonged to a protected class, the plaintiff was qualified for her position, and her unequal pay could qualify as an adverse employment action under at least some circumstances. Nonetheless, the plaintiff cannot prevail on her claims of discrimination under Title VII, § 1981, the NYSHRL, or the NYCHRL because she has not identified sufficient admissible evidence to give rise to an inference of a discriminatory motive. Accordingly, the defendant is entitled to summary judgment on each of these claims.

The plaintiff attempts in several ways to show an inference of discriminatory motive, but none succeeds.  The plaintiff principally argues that her purported comparators -- the other Executive Directors -- are appropriate comparators because each of them and the plaintiff share the same title, report to the same supervisor, oversee a primary program for EA, and are treated by EA as a unit.  This is insufficient to give rise to an inference of discrimination.  Their responsibilities were too different.

For example, unlike the other three Executive Directors, the plaintiff did not need to oversee the operations of a physical building, and did not regularly have to work nights or weekends.  The plaintiff attempts to analogize her role to those of the Executive Directors who worked at standalone community centers, but the attempt fails.  Specifically, the plaintiff notes that she had a role in ensuring the Schools had the necessary equipment for CSYD's programs and that the other Executive Directors had the help of EA's Vice President ("VP") of Operations in overseeing the operations of the buildings. But the plaintiff does not articulate why her limited role in ensuring the Schools were set up for programming is substantially similar to overseeing the full operations and maintenance of a brick-and-mortar community center.  She

37

similarly does not why the assistance of the VP of Operations for the other Executive Directors is relevant in the comparator analysis.

As another illustration of the differences between the plaintiff's role and the other Executive Director roles, the plaintiff did not need to generate funding for her program.  And again, the plaintiff's attempt to analogize the roles in this regard fails.  The plaintiff points out that she engaged in grant writing for her program.  She concedes, however, that she did not consider these grant writing efforts to be part of her responsibilities as Executive Director.  Further, she does not articulate how grant writing compares to the required fundraising activities of the other Executive Directors, which included overseeing fee-for-service programs and, in one instance, advertising and promoting a summer camp.

As these examples illustrate, the plaintiff has not met her burden to show that the other Executive Director positions are adequate comparators to give rise to an inference of discriminatory intent.[13]  At bottom, the plaintiff oversaw a program that was vastly different from those supervised by the

---

[13] And, contrary to the plaintiff's suggestions throughout her memorandum of law, it is her burden to establish that the comparators are sufficiently similar, not the defendant's burden to prove the opposite.

other three Executive Directors.  Where the plaintiff managed a school enrichment program, the three purported comparators managed community and rehabilitation centers.  The plaintiff has not adduced evidence that these jobs are sufficiently comparable for purposes of the plaintiff's discrimination claims.[14]

Next, the plaintiff argues that the amount of pay disparity alone gives rise to an inference of discrimination.  The plaintiff was paid $135,000 annually, for her work as an Executive Director, while the other Executive Directors were each paid fifteen thousand to sixty thousand dollars more.[15] This disparity alone cannot give rise to an inference of discrimination.  All this evidence shows is that the employees had different salaries; it provides no insight into the reasons for the disparity in payment, which is the relevant question. Further, as explained above, the defendant has adduced substantial evidence that the other Executive Directors had

---

[14] At times, the plaintiff suggests that two other individuals -- a white man who ran EA's Head Start program and an African American woman in charge of older adult services -- may also be relevant to the analysis, but she does not provide details on their responsibilities to make them meaningful comparators.

[15] The plaintiff was paid an additional $20,000, beginning in early 2019, to work as Counsel for EA.  The plaintiff declined an offer in late 2019 to receive an annual salary of $155,000 as an Executive Director without performing the work of Counsel.

greater responsibilities than the plaintiff did and different lengths of tenure at EA.

The plaintiff also argues that the different individuals who have held the four Executive Director roles over time gives rise to an inference of discriminatory intent.  Specifically, she notes that the Executive Director of CSYD has always been an African American woman, while the other Executive Directors have been white.  She continues that, because Executive Director salaries are based in part on the salary of an employee's predecessor in the role and because the CSYD Executive Director has always been paid less than the others, EA has created an entrenched pay gap between African American Executive Directors and white Executive Directors.

This argument fails.  Like her evidence regarding the amount of pay disparity, the evidence regarding the history of the plaintiff's position merely indicates that the individual in the CSYD Executive Director position has been paid less than the other Executive Directors.  It does not provide insight into why that is the case.

The plaintiff similarly argues that the compensation history of the three Executive Directors who worked during the plaintiff's tenure at EA gives rise to an inference of discrimination.  For essentially the same reasons as those noted

above, it does not.  To be sure, the other three Executive

Directors received raises during their tenure, and the plaintiff

did not.[16]  The plaintiff's employment with EA, however, spanned

less than three years and almost half of that time was during

the COVID-19 pandemic.  None of the Executive Directors received

a raise during the pandemic due to budget constraints.

Accordingly, the fact that these Executive Directors had

received raises in earlier years is largely immaterial.

The plaintiff also points to the location of her office in

a basement level of the MCC building as evidence of

discriminatory motive.  There is no evidence, however, that her

office assignment was racially motivated, beyond her subjective

feeling that racial discrimination was at play.  Critically, the

CSYD program did not have a permanent physical building, so it

was necessary to situate the plaintiff's office in one of the

three community centers.  The plaintiff does not dispute that it

made sense for EA to place the office in the MCC, which served

as EA's headquarters.  And, there is no evidence that locating

the office in a basement level of the MCC building as opposed to

---

[16] As noted, however, the plaintiff received $20,000 when she
took on the role of Counsel and declined the opportunity to
retain this $20,000 without continuing the additional work as
Counsel.

another level was racially motivated.  The plaintiff shared that floor level with two other employees, one of whom was white.

The plaintiff relies next on statements made in reports by CRE and Onward on EA's diversity efforts, as well as statements in interviews conducted by CRE while preparing its report. Because the plaintiff relies on the statements to prove the truth of the matters asserted therein, the statements are hearsay.  See Fed. R. Evid. 801(c).  Accordingly, the statements are not admissible evidence that the plaintiff can use to help prove her claims.

The plaintiff similarly contends that it was "common knowledge" that African American people were not treated fairly at EA and that employees at EA "openly discussed that Black women were racially discriminated against and paid inequitably." Again, however, the plaintiff's vague assertions are not admissible evidence.

Finally, the plaintiff contends that certain evidence of "dog-whistle racism" shows that EA's management consciously or subconsciously treated the plaintiff worse than others based on racial stereotypes.  As evidence, the plaintiff notes that when she provided feedback to Lawrence on purported triggering language in a draft grant proposal, Lawrence responded in "racially based overtones."  She also points out that Lawrence,

42

in her deposition, twice referred to the plaintiff as "articulate," which plaintiff argues is a "racialized term." And, finally, she notes that, during the meeting in which she was fired, van Capelle stated, "I don't know what that look was," in a "racially tinged tone."

Plaintiff's perceptions and characterizations do not give rise to an inference of EA's discriminatory intent in setting the plaintiff's salary. At bottom, this final argument relies on the plaintiff's subjective interpretation of facially neutral events as "consciously or subconsciously" racist. The plaintiff's attempt to cast these events in a racial lens does not amount to evidence sufficient to survive a motion for summary judgment. Accordingly, for all these reasons, the plaintiff has failed to adduce evidence sufficient to give rise to an inference of discriminatory intent, and the defendant is entitled to summary judgment on the discrimination claims.

Even under the more lenient standards of the NYCHRL and NYSHRL, the plaintiff must show that she was treated less well because of a discriminatory motive. Because there is insufficient evidence that her lower pay as Executive Director was based on her race, even the plaintiff's NYCHRL and NYSHRL discrimination claims must fail.

II.  Retaliation

    A.   Legal Standards

    In addition to forbidding discrimination on the basis of certain protected characteristics, Title VII, § 1981, the NYSHRL, and the NYCHRL also make it unlawful for an employer to discriminate against its employees because those employees have opposed a practice that is made unlawful under other provisions of those statutes.  See, e.g., Lenzi, 944 F.3d at 112.  The framework for evaluating a retaliation claim are the same under Title VII, § 1981, and the NYSHRL.  Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (NYSHRL); Littlejohn, 795 F.3d at 315 (§ 1981).  As noted above, amendments to the NYSHRL require that courts construe that statute "liberally for the accomplishment of [its] remedial purposes."  N.Y. Exec. Law § 300 (2023).

    To make out a prima facie case of retaliation under Title VII, § 1981, or the NYSHRL, the plaintiff "must show that (1) [s]he was engaged in protected activity [under one of the statutes], (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action."  Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86,

44

104 (2d Cir. 2020) (citation omitted); Littlejohn, 795 F.3d at
316; Kelly, 716 F.3d at 14.

Once the plaintiff has established her prima facie case,
"the burden shifts to the employer to articulate some
legitimate, non-retaliatory reason for the employment action."
Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013).
If the defendant does so, the plaintiff must then show that this
"non-retaliatory reason is a mere pretext for retaliation." Id.
The plaintiff has the burden to show that the retaliatory motive
"was a but-for cause of the adverse action and not simply a
substantial or motivating factor." Id. (citation omitted); see
also Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d
Cir. 2015).

Under the NYCHRL, "the plaintiff must show that she took an
action opposing her employer's discrimination, and that, as a
result, the employer engaged in conduct that was reasonably
likely to deter a person from engaging in such action." Leroy
v. Delta Air Lines, Inc., 36 F.4th 469, 474 (2d Cir. 2022)
(citation omitted). Like the NYSHRL, "courts must analyze
NYCHRL claims separately and independently from any
federal . . . claims," because the NYCHRL is to be construed
"broadly in favor of discrimination plaintiffs, to the extent

that such a construction is reasonably possible." Mihalik, 715

F.3d at 109 (citation omitted).

   B.   Analysis

   The defendant's motion for summary judgment on the

plaintiff's retaliation claims is denied.  The plaintiff has

adduced sufficient evidence for a reasonable jury to conclude

that she made at least one complaint of racial discrimination

and that, as a result, she was fired.  Specifically, on April

19, 2021, in reiterating her request for a pay increase, the

plaintiff noted that she was "the lowest paid ED and the other 3

are white" and that "[t]here are at least 50 others at the

agency who are not being paid equitably and can point to gender,

race, religion, and/or sexual orientation" as the reason.  This

qualifies as protected activity.  See Littlejohn, 795 F.3d at

317.[17]  Less than a month later, the plaintiff's employment was

terminated.

   The defendant argues that the plaintiff's April 19 email

was not protected activity because it was not made in good

_____

[17] The parties disagree over whether the plaintiff's earlier
email on April 2 in which she requested "pay parity" given "EA's
DEI [(diversity, equity, and inclusion)] priority" was also
protected activity under the four statutes.  The April 2 request
was too generalized for EA to have understood that the
plaintiff's complaint was directed at conduct prohibited by the
statutes at issue.  See Rojas v. Roman Catholic Diocese of
Rochester, 660 F.3d 98, 108 (2d Cir. 2011).  It therefore does
not qualify as protected activity.

faith.  Specifically, the defendant notes that the plaintiff mentioned fifty other employees who were experiencing discrimination but never produced a list of fifty such individuals.  Whether the accusation was made in good faith is a question of fact.  The plaintiff could have referenced fifty individuals out of frustration or an attempt to illustrate that there was a severe discrimination problem at EA.  Thus, a reasonable jury could conclude that the plaintiff's complaint was made in good faith even if she did not have a list of fifty names to provide to the defendant.

The defendant also argues that the plaintiff's employment was terminated not for retaliatory reasons and was instead justified by, for example, complaints by the Schools' principals, issues with the plaintiff's deficient management of the CSYD budget and staffing, and her poor communication surrounding the Mayor's planned visit to one of the Schools. Given the proximity between the protected activity and termination, however, the plaintiff has presented sufficient evidence to create a factual issue regarding the reasons for the plaintiff's termination.

Accordingly, the defendant's motion for summary judgment on the plaintiff's retaliation claim is denied.  Because the plaintiff has presented sufficient evidence for the Title VII

and § 1981 claims to survive, she has also presented sufficient evidence for the NYCHRL and NYSHRL retaliation claims.

## Conclusion

The defendant's March 31, 2023 motion for summary judgment is granted in part.  The defendant is entitled to summary judgment on the discrimination claims.  It is not entitled to summary judgment on the retaliation claims.  An Order accompanying this Opinion sets forth a schedule for further proceedings in this litigation.

Dated:     New York, New York
           August 3, 2023

                                   _____
                                        DENISE COTE
                              United States District Judge

48