UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------- X
                                        :
PATRICIA CHARLEMAGNE,                   :
                                        :
                          Plaintiff,    :      22cv1136 (DLC)
                                        :
            -v-                         :      OPINION AND
                                        :      ORDER
THE EDUCATIONAL ALLIANCE, INC.,         :
                                        :
                          Defendant.    :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiff Patricia Charlemagne:
Michelle A. Caiola
Jonathan M. Goldhirsch
Phillips & Associates, PLLC
45 Broadway, Suite 430
New York, NY 10006

For defendant The Educational Alliance, Inc.:
Adam M. Felsenstein
Amanda M. Leone
Jason B. Klimpl
Janae C. Cummings
Tannenbaum Helpern Syracuse & Hirschtritt LLP
900 Third Avenue
New York, NY 10022

DENISE COTE, District Judge:

The defendant The Educational Alliance, Inc. ("EA") has moved for reconsideration of that portion of the Court's August 3, 2023 Opinion which denied summary judgment on the plaintiff's claims of retaliation. Charlemagne v. Educational Alliance, Inc., No. 22cv1136 (DLC), 2023 WL 4977336 (S.D.N.Y. Aug. 3,

2023) ("Opinion").  For the following reasons, the motion is granted.

## Background

Through this lawsuit, the plaintiff pursued claims of discrimination based on her compensation and claims of retaliation stemming from the termination of her employment. Judgment was granted in EA's favor on the discrimination claims. Id. at *12–16.  The Opinion is incorporated by reference and familiarity with it is assumed.  The following facts are taken from the record presented by the parties on the summary judgment motion to the extent they are relevant to the retaliation claims.  These facts are either undisputed or taken in the light most favorable to the plaintiff unless otherwise noted.

The plaintiff Dr. Patricia Charlemagne, who identifies herself as an African American, is a former Executive Director of EA.  EA is a non-profit organization that provides educational, cultural, health, wellness, and social services in the Lower East Side and East Village neighborhoods of Manhattan. The plaintiff worked at EA from September 12, 2018 until EA terminated her employment on May 10, 2021.

During her employment at EA, the plaintiff served as its Executive Director ("ED") of the Community Schools and Youth Development program ("CSYD").  Through this program, EA runs school enrichment activities at several local elementary and

middle schools, operating out of the schools it serves in four separate locations.  The CSYD program primarily serves students of color, many of whom are not meeting proficiency standards in either English or math, and many of whom live in public housing or shelters.

The job description for the Executive Director of CSYD included "design, manage and take overall responsibility for developing program budgets that align to program goals" and "work with finance and program leaders to monitor expenditures, ensure accountability, and oversee budget tracking and reporting to ensure responsible, and on budget, fiscal management of programs and contracts."  In her role as ED, the plaintiff worked with the Finance Team at EA to manage the CSYD budget. The plaintiff was also required to develop and maintain relationships with the principals of the schools whose students were served by CSYD.  Finally, as relevant here, as the Executive Director of CSYD, the plaintiff was required to supervise CSYD staff to ensure the program was maximizing the talent of its employees.  The CSYD staff included approximately 200 to 300 part-time employees and ten to fifteen full-time direct reports.

EA's President and CEO at the time of plaintiff's employment was Alan van Capelle.  In the summer of 2019, principals from the schools served by CSYD complained to van

Capelle about the plaintiff's performance.  At a meeting with three of them, the principals asked van Capelle to fire the plaintiff because she was not being collaborative and was making decisions in a way that negatively affected their schools.  Van Capelle did not fire the plaintiff but gave her feedback on her management style and communication with the principals.

The events leading to the termination of the plaintiff's employment in 2021 include the following.  On April 2, 2021, a Friday, one of EA's budget analysts emailed the plaintiff and others a list of questions relating to the CSYD budget, including questions about how EA intended to spend multiple underspent grant funds.  According to this analysis, the CSYD budget had over $500,000 in unspent funds.  The funds were to be used by June 30, 2021.  CSYD is funded through grants offered by government agencies and private foundations.  For at least some of these sources, if the funds are not used in accordance with the grant's terms and conditions or are underspent, EA risks losing the funding.

The plaintiff responded to the email inquiry within 30 minutes with her "preliminary thoughts", and then ten minutes later sent an email request for an increase in her pay that would be retroactive for the fiscal year 2021.  Her request was sent to the Controller, Budget Analyst, and Grants Compliance Manager.  These individuals are not among those responsible to

setting the plaintiff's salary and the Controller promptly
advised the plaintiff that she should speak to her supervisor
and another executive.

The plaintiff promptly forwarded the email chain to her
supervisor, Donna Lawrence, and explained that she wanted to
"revisit [her] request for pay parity."  The following Monday,
April 5, EA's Executive Team met and among other things
discussed the plaintiff's request for a salary increase.  The
Executive Team agreed that the plaintiff needed to be written up
for requesting a raise from the Finance Team, and Jean
Desravines, the Chief People and Equity Officer at EA, was given
the task of drafting a warning memo.  The Executive Team also
took steps to better understand whether the plaintiff's salary
was appropriate.

At an April 8 meeting of the Executive Team, they discussed
the plaintiff's salary.  Desravines was still working on the
warning memo.  The draft of that memo characterized the
plaintiff's behavior in asking for a raise from members of the
Finance Team rather than from Lawrence and Desravines as
"unethical" and "inappropriate".  In an April 12 email about the
draft memo, Desravines described the plaintiff's behavior in
making the request to the Finance Team as "erratic" and
"unprofessional."  Desravines conducted an analysis of the
plaintiff's salary, including by looking at salaries reflected

in a settlement house survey, and determined that plaintiff's
salary was on a par or higher than the salaries of others
performing similar roles in other organizations.  Desravines
reported the findings of his analysis to the plaintiff during
the meeting held to terminate her employment on May 10.

On April 19, in a response to Desravines' proposal for a
new procedure for requesting raises and cost-of-living
adjustments at EA, the plaintiff stated that "any strategy to
systematize increases should be postponed until there is pay
equity at EA."  She asserted that "I am the lowest paid ED and
the other 3 are white (2 men, 2 Jewish) who earn considerably
more."  She also asserted that "[t]here are at least 50 others
at the agency who are not being paid equitably and can point to
gender, race, religion, and/or sexual orientation as being the
notable difference between themselves and their higher paid
peer."  The Opinion found that this email constituted a
complaint of discrimination.  Id. at *16.

Desravines responded on April 21 that EA was taking her
request seriously and asked for the names of the 50 staff
members.  The following day, the plaintiff responded with a list
of 27 names, one of which was her own.  EA's analysis of the
salaries of those individuals resulted in its conclusion that
there were no problems regarding their salaries.

On April 21, the plaintiff sent an email to Lawrence that
began a chain of events critical to EA's decision to terminate
plaintiff's employment.  The plaintiff's email had no text in
its body, but had a subject line that read, "[b]ased on
performance, Mayor will be visiting our 142 DYCD Program --
details will follow."  DYCD was one of the funding programs
under the umbrella of CSYD.  Lawrence and the plaintiff
exchanged emails so that Lawrence could get a better
understanding "of the genesis and purpose" of the Mayor's visit
to the EA program.  The plaintiff explained that the Mayor and
School Chancellor were "confirmed for a site visit" at one of
the programs at P.S. 142 at 7:45 a.m. and "DYCD [was] still
working on scheduling an afternoon visit."

In response to this information from the plaintiff, van
Capelle reached out to the principal of P.S. 142, Daphna
Guttman, to ask about the Mayor's visit.  Guttman informed van
Capelle that the Mayor's visit did not concern the CSYD program
and that that program was struggling.  Guttman reported that the
CSYD program at the school was severely understaffed, causing
its programs to be canceled regularly.  She also explained that
Department of Education teachers had begun to cover the after-
school programs without pay in an attempt to solve the
understaffing problem.  Furthermore, Guttman complained about a

holiday party thrown by the plaintiff for CSYD and its staff,
describing it as "exorbitant".

Based on these complaints, van Capelle reached out to other
principals who expressed that the CSYD programs at their schools
were having similar problems.  One of these principals reminded
van Capelle that she and four other principals had approached
van Capelle in July 2019 with concerns about the plaintiff's
management of CSYD.  At that time, Van Capelle did not fire the
plaintiff in response to these concerns.  Because of van
Capelle's decision not to fire the plaintiff, the principal
concluded that van Capelle would not listen to the group's
concerns even as the situation worsened.

Meanwhile, on April 25, Lawrence emailed the plaintiff
about an error in the expensing of funds.  In the email,
Lawrence stated, "When you and I discussed the cost for the
Harvard class you told me that we would be charging the expense
to DYCD since we are so underspent in that contract."[1]  Lawrence
pointed out that much of the expense was instead charged to
"Arabella and unrestricted funds".[2]  Lawrence and the plaintiff
exchanged emails over the next two days.  When Lawrence asked
the plaintiff to identify who was responsible for the error, the

---

[1] The reference to a Harvard class appears to be a reference to a
professional development class held by Harvard University.

[2] Arabella is a funding source for CSYD.

plaintiff responded that she was: "As ED of the department, I will accept full responsibility for the error."  She did not identify any other person responsible for the error.

At this time, there was roughly $526,000 in unspent DYCD funds.  On April 29, Lawrence directed the plaintiff to develop a plan to utilize the unspent DYCD funds within the six weeks remaining in the 2021 fiscal year.  Lawrence instructed the plaintiff to submit this plan by May 4.  On May 4, the plaintiff sent her proposal, titled "Strategy to spend down FY'21 DYCD awards."  The proposal had four elements.  The first was to hold Saturday programs for the community, although the proposal noted that EA may not be able to arrange staffing for the programs. The second was a retroactive pay increase for staff known as "group mentors."  The third was the purchase of supplies on EA's "wish list."  The last was titled "Wellness Saturday Professional Development."  The proposal suggested that part-time staff receive two hours of professional development time to be used each week in "various wellness activities of their choosing."  Lawrence provided comments to this proposed solution, writing "[e]ssentially paying staff to meditate, do yoga, etc. on their own, with no accountability; not something we would suggest city funds be used for; DYCD not approve."  On May 10, Lawrence sent an email to Mark Enselman, EA's Chief

Financial Officer, to let him know that the plaintiff's proposed solutions would not be approved.

At a meeting on May 10, held virtually, EA terminated the plaintiff's employment.  Desravines drafted talking points for the meeting that included justifications for the termination. Those justifications included: the plaintiff's misrepresentation about the Mayor's visit; staffing issues in DYCD programs; the plaintiff's failure to raise these staffing issues to EA leadership; the plaintiff's use of DYCD money to host a "lavish" holiday party; the plaintiff's loss of credibility with school principals and EA leadership; the plaintiff's proposal to use DYCD funds to pay staff for two hours to meditate and go for a walk, which the plaintiff stated was "professional development" and which Desravines characterized as "fraud"; the plaintiff's refusal to meet with Human Resources and other managers;[3] the plaintiff's "unacceptable and negligent behavior"; the plaintiff's poor performance and poor management; and the plaintiff's "reckless approach" to her responsibilities.

Desravines and van Capelle attended the May 10 meeting with the plaintiff.  It was held over Zoom and the plaintiff recorded the meeting on her phone.  During this meeting, van Capelle

---

[3] In February of 2021, the plaintiff and the other EDs were asked to meet monthly with the head of HR.  The plaintiff refused to do so, as reflected in a series of emails.

discussed the salary concerns raised by the plaintiff and reasons for the termination of the plaintiff's employment.

Van Capelle reviewed EA's determination that the plaintiff had been paid fairly and that the other 26 individuals she had identified were also paid fairly.  Van Capelle explained that other EA Executive Directors had higher salaries than the plaintiff because they carried more responsibility than she did. Their responsibilities include fundraising, management of brick-and-mortar buildings, management of larger teams, and administration of multi-million dollar budgets.  Van Capelle added that the plaintiff's salary was generally above market when compared to the salaries for similar positions at other settlement houses.

Van Capelle explained to the plaintiff that she was being fired because of her subpar performance, which included staffing issues that were not properly handled, school principals' dissatisfaction with the plaintiff's work, the use of DYCD funds for a lavish holiday party, and the leadership team's loss of confidence in the plaintiff's management of the program.  During this meeting, the plaintiff asserted that the staffing issues

had been raised to Lawrence and the leadership team at various points during her tenure at EA.[4]

After it fired the plaintiff, EA learned that there were additional, significant budget errors relating to the plaintiff's work with CSYD.  Joanna Samuels, the Executive Director of the Manny Cantor Center, one of EA's brick-and-mortar locations, assisted with CSYD's budget process after the plaintiff's employment was terminated.  Samuels found that the plaintiff had not included any staff salaries in the budget for her programs.  EA leadership also discovered that the plaintiff had attributed several part-time employees' salaries to a program for which they did not perform services.  When reporting this discovery to Enselman, van Capelle, and Desravines, Lawrence stated that it was a serious issue of compliance and could have put EA "at serious risk of falsifying records."

## Discussion

On August 18, 2023, EA moved for reconsideration of that portion of the August 3, 2023 Opinion that denied EA's motion for summary judgment on the plaintiff's retaliation claims.  "A motion for reconsideration is an extraordinary request that is granted only in rare circumstances, such as where the court

---

[4] The plaintiff informed van Capelle and Lawrence that CSYD was understaffed in an email dated September 29, 2020 and in her May 5, 2021 budget proposal.

failed to consider evidence or binding authority." Van Buskirk
v. United Grp. Of Cos., Inc., 935 F.3d 49, 54 (2d Cir. 2019).
"The standard for granting such a motion is strict, and
reconsideration will generally be denied unless the moving party
can point to controlling decisions or data that the court
overlooked -- matters, in other words, that might reasonably be
expected to alter the conclusion reached by the court." Cho v.
Blackberry Ltd., 991 F.3d 155, 170 (2d Cir. 2021) (citation
omitted).

     The Opinion found that the plaintiff had engaged in
protected activity on April 19, when she complained that she was
"the lowest paid ED and the other 3 are white" and that "[t]here
are at least 50 others at the agency who are not being paid
equitably and can point to gender, race, religion, and/or sexual
orientation" as the reason. Charlemagne, 2023 WL 4977336, at
*16. It denied the motion for summary judgment on the
retaliation claims, explaining that, "[g]iven the temporal
proximity between the protected activity and termination," the
plaintiff had presented sufficient evidence "to create a factual
issue regarding the reasons for [her] termination." Id. at *17.

     EA asserts, correctly, that the Opinion erred in describing
the legal standard that governs its motion. Temporal proximity
between the plaintiff's protected conduct and the termination of
her employment does not, by itself, satisfy the plaintiff's

ultimate burden to prove that the reason for the adverse
employment action was retaliatory.  EA has requested that this
Court reconsider its Opinion on summary judgment regarding the
plaintiff's retaliation claims under Title VII, § 1981, the
NYSHRL, and the NYSCRL.  That request is granted.

Retaliation claims brought under Title VII are analyzed
using the burden-shifting test established by the Supreme Court
in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Carr
v. N.Y.C. Transit Auth., 76 F.4th 172, 178 (2d Cir. 2023).  If a
plaintiff can demonstrate a prima facie case of retaliation
under this test, a defendant may rebut this showing "by
providing a legitimate, non-retaliatory reason for the
allegedly retaliatory action."  Id. (citation omitted).  If the
defendant provides this reason, "the presumption
of retaliation dissipates, and the plaintiff must prove that the
desire to retaliate was the but-for cause of the challenged
employment action."  Id. (citation omitted).

An employer is entitled to set its own standards for its
employees' satisfactory job performance.  Ya-Chen Chen v. City
Univ. of N.Y., 805 F.3d 59, 73 (2d Cir. 2015); Thornley v.
Penton Pub., Inc., 104 F.3d 26, 29 (2d Cir. 1997).  Those
standards may not, however, serve as a pretext for
discrimination or retaliation.  See, e.g., Ruiz v. County of
Rockland, 609 F.3d 486, 493 (2d Cir. 2010); Thornley, 104 F.3d

at 30; Graziadio v. Culinary Inst. Of Am., 817 F.3d 415, 430 (2d
Cir. 2016).

　　　"The temporal proximity of events may give rise to an
inference of retaliation for the purposes of establishing a
prima facie case of retaliation under Title VII, but without
more, such temporal proximity is insufficient to satisfy
[plaintiff]'s burden to bring forward some evidence of pretext."
El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir.
2010).  See Bentley v. AutoZoners, LLC, 935 F.3d 76, 90 (2d Cir.
2019).  "Indeed, a plaintiff must come forward with some
evidence of pretext in order to raise a triable issue of fact."
El Sayed, 627 F.3d at 933.

　　　The framework for evaluating a retaliation claim is the
same under Title VII, § 1981, and the NYSHRL.  Banks v. Gen.
Motors, LLC, et al., No. 21-2640, 2023 WL 5761361, at *20 (2d
Cir. 2023); Littlejohn v. City of New York, 795 F.3d 297, 315
(2d Cir. 2015) (§ 1981); Kelly v. Howard I. Shapiro & Assocs.
Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013)
(NYSHRL).  Amendments to the NYSHRL require that courts construe
that statute "liberally for the accomplishment of [its] remedial
purposes."  N.Y. Exec. Law § 300 (2023).

　　　"To prevail on a retaliation claim under the NYCHRL, the
plaintiff must show that she took an action opposing her
employer's discrimination, and that, as a result, the employer

engaged in conduct that was reasonably likely to deter a person from engaging in such action." Leroy v. Delta Air Lines, Inc., 36 F.4th 469, 474 (2d Cir. 2022) (citation omitted). Like the NYSHRL, "courts must analyze NYCHRL claims separately and independently from any federal ... claims," because the NYCHRL is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Williams v. N.Y.C. Hous. Auth, 61 F.4th 55, 69-70 (2d Cir. 2023) (citation omitted).

In support of its summary judgment motion, EA explains that there were several factors that contributed to its decision to terminate the plaintiff's employment but emphasizes two of them. Of "paramount importance" were the plaintiff's "deteriorated relationships with the principals" and the deficiencies in plaintiff's management of CSYD that came to light in the discussions with the principals. Second, EA fired the plaintiff because of her mismanagement of the CSYD budget. EA has carried its burden of showing that each of these was a non-retaliatory and sufficient ground for terminating the plaintiff's employment. The plaintiff has failed to produce evidence to raise a question of fact that either of these reasons was pretextual.

1.    Principals' Complaints

The plaintiff's April 21, 2021 notification about the Mayor's visit led van Capelle to contact the principals of the schools served by CSYD.  Each of those principals complained to van Capelle about the plaintiff and her management of the CSYD program.  As the plaintiff acknowledges, management of the CSYD relationship with the principals was a core responsibility of the CSYD Executive Director.  The complaints made by the principals about the plaintiff were serious and went to the heart of the performance of the CSYD program and the services it was to provide to students and their families.  Van Capelle was reminded during those conversations that he had refused to fire the plaintiff in July of 2019 despite the principals' request that he do so.

The plaintiff does not dispute that these conversations with the principals occurred as they are described by EA.  She does not dispute either that the principals sought her dismissal in July of 2019 or that each of them complained of her performance when contacted again in April 2021.  She does not dispute that she advised EA that the Mayor would be visiting a CSYD school due to the CSYD performance, when that was not true.  The plaintiff acknowledges that the CSYD program was understaffed, although she argues that the understaffing was due

to low pay and the slow process for conducting background checks.

The plaintiff has failed to offer evidence to raise a question of fact that this ground for the termination of the plaintiff's employment was pretextual.  EA has offered undisputed evidence that the complaints from the school principals about the plaintiff's performance constitute a legitimate, non-retaliatory reason for the termination of the plaintiff's employment.

2.   Budget

In April of 2021, EA learned that the CSYD program had serious budgetary problems, including that over $500,000 of its approximately $5 million budget was unspent with only weeks remaining in the fiscal year.  Plaintiff's job included the management of the CSYD budget.  Plaintiff did not present a plan that was acceptable to EA for spending the $500,000 in the remaining weeks of the funding period.  Furthermore, when asked why the expensive Harvard professional development program was not charged as had been agreed, the plaintiff provided no explanation for the error beyond taking responsibility for it.

The plaintiff does not dispute the fact that approximately six weeks remained before the end of fiscal year 2021, and that there was more than $500,000 in unspent funds in CSYD's budget. She argues, however, that she proposed four solutions to "spend

down" the budget.  EA rejected the plaintiff's proposals.  It
considered that one of the four proposals would render it
vulnerable to charges of fraud.  It was entirely appropriate for
EA to consider its contractual obligations and its own
established guidelines when determining whether the plaintiff's
proposals were appropriate and to reject them if it concluded
they were not.  The plaintiff has not offered evidence to raise
a question of fact that EA's concerns about her mismanagement of
the budget or its rejection of her proposals were retaliatory or
for other than legitimate reasons.

The plaintiff argues that she was not solely responsible
for the budget.  She points out that she had quarterly meetings
with the Finance Team.  But the plaintiff does not dispute that,
as ED of CSYD, the CSYD budget was her responsibility and that
the error in charging certain CSYD expenses to the wrong program
was her error.  The plaintiff's failure to manage the CSYD
budget was a second non-retaliatory reason for the termination
of the plaintiff's employment.

3.    Plaintiff's Arguments

The plaintiff raises two arguments in opposition to this
motion for summary judgment that have not already been
addressed.  Neither of these arguments, taken singly or
together, is sufficient to raise an inference that the reasons

given by EA for the termination of plaintiff's employment were pretextual.

The plaintiff argues that EA's shifting rationale for her firing creates evidence of pretext. She points to several of the reasons supporting the termination decision that are contained in the memo prepared in advance of the termination meeting that EA has not emphasized in its motion for summary judgment. They include her refusal to meet with managers about her responsibilities, her refusal to attend meetings with HR, and her "unprofessional" request to the Finance Team for a raise. The fact that EA chose, when making its motion for summary judgment, to emphasize only two of several grounds it has given for its termination decision does not suggest that the two reasons were pretextual. The plaintiff has not provided evidence to place in dispute any essential feature of the two grounds on which EA relies.

Finally, the plaintiff relies on the temporal connection between her protected activity on April 19 and her firing on May 10 to argue that the termination of her employment was due to her complaint of discrimination. She points in particular to what she describes as EA's angry response to her assertion on April 19 that 50 employees at EA were being discriminated against in terms of their pay and to what she characterizes as an inadequate investigation of the pay for the 27 individuals

20

she identified by name.  This temporal proximity does not
prevent the dismissal of the retaliation claim.  Other events
explain why her employment was terminated on May 10.

The plaintiff's own false statement about the Mayor's visit
triggered the call to one principal and that principal's serious
complaints about the plaintiff led to further calls to
principals.  As for the budgetary problems, those came to light
in the ordinary course near the end of the fiscal year and
plaintiff has pointed to nothing to suggest otherwise.  The
proximity between her April 19 complaint and the May 10
termination of her employment is not sufficient to raise a
question of fact regarding the non-retaliatory reasons given by
EA for the termination of her employment.  Under the El Sayed
standard, the plaintiff has not met her burden.

Even though the NYCHRL and NYSHRL claims must be considered
separately and are governed by more lenient standards than their
federal counterpart, the plaintiff must still show that EA's
retaliatory intent caused the termination of her employment.
Because there is insufficient evidence that either of EA's
reasons for terminating the plaintiff's employment was
pretextual, the plaintiff's NYCHRL and NYSHRL retaliation claims
also fail.

## Conclusion

The defendant's August 18, 2023 motion for reconsideration is granted.  The defendant's March 31, 2023 motion for summary judgment is granted in its entirety, including on the retaliation claims.

Dated:    New York, New York
          September 11, 2023


                                    _____
                                    DENISE COTE
                                    United States District Judge